**In re Mark Terry SCHMIDT and Tamera Lynn Horner, Debtors.**

**Mark Terry Schmidt and Tamera Lynn Horner, Plaintiffs,**

v.

**SLM Corporation, Educational Credit Management Corporation, National Student Loan Program, Baker University and United States Department of Education, Defendants.**

Bankruptcy No. 02–42802–JWV. Adversary No. 02–4382.

United States Bankruptcy Court, W.D. Missouri.

June 4, 2003.

Tracy Robinson, Kansas City, MO, for Debtors.

Larry Bork, for Educational Credit Management Corp.

Judith Strong, Kansas City, MO, for U.S. Dept. of Education.

## MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

The Debtors, Mark Terry Schmidt and Tamera Lynn Horner, filed a Complaint to Determine Dischargeability on December 31, 2002, seeking a discharge of their student loan debts pursuant to 11 U.S.C. § 523(a)(8) on the basis of undue hardship. On April 23, 2003, a trial was held on this matter at the United States Courthouse in Kansas City, Missouri. Tracy Robinson represented the Debtors/Plaintiffs Mark Terry Schmidt and Tamera Lynn Horner. Larry Bork appeared for the Defendant Educational Credit Management Corp. ("ECMC"). Judith Strong appeared for Defendant U.S. Department of Education. Defendants SLM Corporation, National Student Loan Program, and Baker University did not file responsive pleadings and did not appear at trial.[1] The Court took the matter under advisement after hearing the evidence and the arguments of counsel. Upon consideration of the evidence and relevant case law, the Court is now ready to rule.

For the reasons set out below, the Court finds that the Debtors have failed to meet their burden to prove that repayment of their student loans would constitute an undue hardship as defined by present law. Therefore, the Debtors' obligation to repay their student loans will not be discharged in these bankruptcy proceedings.[2]

---

1. On April 24, 2003, this Court granted Plaintiff's Motions for Default Judgment against each of these Defendants.

2. This Court has jurisdiction of this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This Memorandum

## FACTUAL BACKGROUND

The parties have stipulated to many of the facts in this case and to the authenticity of the exhibits admitted into evidence.[3] In addition, there was evidence adduced at trial.

### A. Joint Stipulation of Facts

1. Mark Terry Schmidt ("Schmidt") and Tamera Lynn Horner ("Horner") (collectively referred to as "Debtors") filed for relief under Chapter 7 of the Bankruptcy Code on May 29, 2002.

2. Schmidt and Horner were married July 3, 1987. (Ex. 6, page 24) Schmidt is 48 years old. Horner is 42 years old.

3. Schmidt's son, Justin, was born on May 29, 1982, and is was 20 years old at the time of the hearing. (Ex. 18, page 7) Schmidt/Horner's son, Thomas, is ten years old. (Ex. 18, page 7, and Ex. 21, page 70) Schmidt/Horner's son, Michael, is seven years old. (Ex. 18, page 7, and Ex. 21, page 70)

4. The Complaint and the Schedules allege that (a) Sallie Mae (ECMC) is due $21,655.63 (joint obligation); (b) ECMC is due $35,169.96 (wife's obligation); and (c) Education Direct Loans, William D. Ford Federal Direct Loan, is due $126,059.66 (wife's obligations of $38,885.62 and husband's obligations of $87,174.04). (Ex. 2, pages 43, 54, 71, and 78)

5. In their Schedule I, Schmidt/Horner showed that Schmidt had a current monthly gross income of $2,418.00 and net income of $1,987.31. (Ex. 2, page 81)

6. In their Schedule J, Schmidt/Horner showed current monthly expenditures of $3,530.00. (Ex. 2, page 82)

7. At Schedule D, Creditors Holding Secured Claims, a claim of $14,962.94 is shown due on Schmidt's 1993 Ford F150 Extended Cab Pickup Truck, which has a scheduled value of $8,400.00. (Ex. 2, pages 33 and 37)

8. Horner's 1993 Ford Aerostar Van, has a scheduled value of $3,150.00 and her vehicle is cross-collateralized with her husband's truck. (Ex. 2, page 33, Ex. 3, page 1)

9. In 1998, Schmidt/Horner's IRS tax return showed wages of $32,113.00 and total income of $29,896.00 after a business loss of $4,004.00 and receipt of $1,787.00 in unemployment compensation. They received an $888.00 refund. (Ex. 9, pages 1 and 1A)

10. In 1999, Schmidt/Horner's IRS tax return showed wages of $35,517.00 and total income of $39,234.00, including unemployment compensation of $4,709.00 and a business loss of $985.00. Debtors received a $2,159.00 refund. (Ex. 10, pages 1–2)

11. In 2000, Schmidt/Horner's IRS tax return showed wages of $48,834.00 and total income of $47,600.00, including a business loss of $1,234.00.

---

Opinion and Order constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

**3.** The parties filed a "Joint Statement of Facts to Which There Is No Dispute." The document is 60 pages long and contains 329 numbered paragraphs. The Court has repeated only the most relevant points necessary for discussion and has combined paragraphs when feasible. The Court has considered all of the stipulated statements of facts as well as the three volumes of exhibits presented.

Debtors received a $299.00 refund. (Ex. 11, pages 1–2)

12. In 2001, Schmidt/Horner's IRS tax return showed wages of $50,267.00 and total income of $48,517.00, including a business loss of $1,750.00. Debtors received a $502.00 refund. (Ex. 12, page 1)

13. In 2002, Schmidt/Horner's IRS tax return showed wages of $31,428.67 and total income of $44,827.95. This amount included a $3,649.28 IRA distribution and $9,750.00 in unemployment compensation. They received a tax refund of $2,077.37. (Ex. 13, pages 1–2)

14. Horner received a high school diploma in May 1979 from Wichita Southeast High School. She attended Kansas State University, Friends University, and Washburn University. She received an Associates Degree in Paralegal Studies from Washburn University in December 1996, a Bachelors of Science Degree in Criminal Justice from Washburn University in December 1996, and a Master of Science Degree in Management from Baker University in December 2001. (Ex. 6, page 23)

15. Horner is employed by the Raytown School District, Raytown, Missouri, as a substitute teacher and/or teacher's aid for school year 2002–2003, as needed. (Ex. 6, page 25)

16. From approximately February 25, 2002, to March 29, 2002, Horner was employed as a legal assistant by Secretary at Law, Kansas City, Missouri, a temporary work agency. (Ex. 6, page 25)

17. From approximately February 19 to February 21, 2002, Horner was employed by Spencer Reed Group, Inc., Temporary Work Agency as a legal secretary. (Ex. 6, page 25)

18. Horner was employed by the City of Kansas City, Missouri, as a secretary from June 1999 to January 2002. (Ex. 6, page 25)

19. Horner was employed by the State of Kansas, Board of Indigents Appellate Defenders Office, Topeka, Kansas, from February 1998 to June 1999 as an Office Assistant II doing clerical and administrative duties as assigned. (Ex. 6, page 25)

20. Horner was employed by Legal Temps Services from February 16, 1998, to February 21, 1998, as a legal secretary with a law firm in Topeka, Kansas. (Ex. 6, page 25)

21. Horner was employed by Western Staffing Services, a temporary agency in Topeka, Kansas, as a receptionist from November 1997 to January 1998. (Ex. 6, page 25)

22. Horner was employed by Key Temporary Services, Topeka, Kansas, as a legal assistant with clerical duties from April 1997 to September 1997. (Ex. 6, page 25)

23. Horner was employed by Key Temporary Services, Topeka, Kansas, as a legal assistant from January 20, 1997, to February 28, 1997. (Ex. 6, page 25)

24. Horner was a member of the United States Kansas Army National Guard in Topeka, Kansas, as a Finance Specialist 73C from December 1988 to December 1996. (Ex. 6, page 25)

25. Horner produced earnings statements for her employment with the City of Kansas City, Missouri, from the pay period ending December 29, 2001, to the pay period ending

January 26, 2002, showing a monthly wage of $2,395.00 and gross earning year-to-date totals as of the end of the pay period of $2,321.32. (Ex. 16, pages 1–3)

26. Horner's Social Security statement reflects income of $25,186.00 in 2001; $23,045.00 in 2000; $16,734.00 in 1999; and $11,454.00 in 1998. (Ex. 14, page 3)

27. Schmidt's biographical sketch dated January 9, 2001, indicates he became a Staff Sergeant on November 2, 2001, and has a total of 17 years in the National Guard. Schmidt attended Kansas Technical Institute, Salina, Kansas, in the 1970s; Kansas State University, Manhattan, Kansas, in 1988–1989; and Washburn University, Topeka, Kansas, 1989 to 1999. Schmidt received an Associate of Arts, Legal Assistant Program, in 1993 with Honors at Washburn University; a Bachelors of Science in Criminal Justice, Law Enforcement, in 1996, Cum Laude at Washburn; and he is a Masters Candidate in Criminal Justice Administration at Washburn University, Topeka, Kansas. (Ex. 32, page 23, Ex. 38, pages 1–2)

28. Schmidt's Social Security statement reflects income of $29,348.00 in 2001; $28,575.00 in 2000; $19,890.00 in 1999; and $11,432.00 in 1998. (Ex. 35, page 2)

## B. Additional Findings of Fact

In addition to the stipulated facts, the Court makes the following factual findings from the evidence adduced at trial:

In January 2002, Horner was terminated from her employment with the City of Kansas City after she successfully appealed an adverse rating by her supervisor. Although she believes that she was fired in retaliation for taking that appeal, she admits that her dismissal was due to using documents without proper authorization in order to succeed in her appeal. Horner has been receiving unemployment benefits and has been actively seeking a full-time position since January 2002. After she was terminated by the City, she was able to find temporary work as a legal secretary until March 2002.

At the present time, Horner works part-time at Toys R Us in the evenings approximately 12 hours per week at $6.30 per hour. She also receives unemployment compensation of $250.00 per week, but this benefit was scheduled to end within two weeks of the hearing and Horner did not know if she would be eligible to reapply. She does not suffer from any type of disability that would prevent her from working a full-time position. She has been diligent in searching for a new job. Horner testified that she would need approximately $2,500.00 per month more in income (excluding her unemployment benefit that she currently receives of more than $1,000.00 per month) to meet a minimum standard of living. She hopes to find a position that starts in the $23,000.00—$24,000.00 annual range. Horner's gross earnings for 1999 were $16,734; however, her gross earnings rose to $23,045.00 in 2000 and $25,186.00 for 2001. (Ex. 14, pg. 3)

Horner does not pay child care expenses at the present time but anticipates that, when she returns to work full-time, she will have to pay approximately $100.00 per week for before and after school care for the children. She testified that she would expect to pay $600.00 per month in the summer for full-time childcare, not including extra expenses associated with field trips and other activities.

Schmidt is currently employed with the City of Kansas City, Missouri, as a parale-

gal in the litigation division and has worked for the City for four years. Even though this is a full-time position, Schmidt testified that at times he is unable to work 40 hours per week and takes time off for personal medical appointments and family medical appointments.

In March 2002, Schmidt had a heart attack that led to double bypass surgery on April 2, 2002. Although Schmidt has recovered from the surgery, his Doctor has advised him to give up his hobby of go-cart racing and to refrain from stressful activities. Schmidt testified that his Doctor has advised him not to seek extra part-time work.

Even with the time off for his medical condition, Schmidt testified that he is doing well in his position and, although there is no room for advancement, he is able to earn annual merit raises. He is scheduled for an annual review soon and expects to receive a 2–4 percent raise this summer.

Schmidt's oldest son, Justin, is temporarily living in the household but is employed full-time and providing for his own expenses. Justin also pays for the household's high-speed internet cable service. He is expected to move out of the home soon.

Schmidt served in the Kansas National Guard from 1985 until December 31, 2002, when he was granted a medical retirement because of his heart condition. Schmidt, testified that he will get 16 years of credit for his military service and at age 60 (in 12 years) he will be eligible to apply for a monthly pension. Schmidt could not testi-fy as to how much the monthly benefit would be and apparently has not inquired into what amount he would be entitled to at that time. Generally consistent with Horner's testimony, Schmidt testified the Debtors would need an additional $1,200.00 a month over their present income to meet a minimum standard of living. All four of the family members take medications on a daily basis. Horner and her two children take an allergy medication every day. In addition, Horner takes estrogen and a medication for asthma. Thomas also takes asthma medication. Michael requires a daily medication for ADHD. Schmidt takes two prescription medications daily for his heart condition. Their medications cost approximately $300.00 per month.

## DISCUSSION

 Section 523(a)(8) of the Bankruptcy Code provides that educational or student loans are excepted from the general discharge provisions of the Bankruptcy Code "unless excepting such debt[s] from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8).[4] Congress did not define undue hardship; therefore, it has been left to the courts to decide on a case-by-case basis what constitutes undue hardship. The Eighth Circuit in a recent decision has reaffirmed the "totality of the circumstances" test as set forth in *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir.1981). *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir.2003). The Eighth Cir-

---

4. Section 523(a)(8) of the Bankruptcy code provides: (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

 (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any pro-gram funded in whole or in part by a governmental unit or nonprofit institution, or for any obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents. 11 U.S.C. § 523(a)(8).

cuit directs us to consider (1) the debtor's past, current and reasonably reliable future financial resources; (2) the reasonable necessary living expenses of the debtor and the debtor's dependents; and (3) any other relevant facts and circumstances unique to the particular bankruptcy case. *Long,* 322 F.3d at 554. The Eighth Circuit further synthesized the rule, explaining "if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged." *Id.* It is incumbent upon the debtor to prove undue hardship by a preponderance of the evidence. *Andrews,* 661 F.2d at 704.

Applying the totality of the circumstances test to the instant case we examine each factor separately:

## 1. The Debtor's Past, Present and Reasonably Reliable Future Financial Resources

Under *Andrews,* the first factor is an analysis of the debtor's past, present and reasonably reliable future financial resources.

Despite their present—and, most likely, temporary—financial difficulties, the Debtors have shown a history of substantial earnings and this history, combined with their education and experience, convinces the Court that the Debtors will have sufficient income in coming years to pay at least a part of their student loan debts. In 2000 and 2001, when both of the Debtors were fully employed, their annual income was in the range of $50,000.00 before taking into account small business losses related to Schmidt's hobby of go-cart racing. That sideline has now been discontinued, and thus the losses are eliminated. In short, the Debtors have demonstrated an ability in recent years to earn a substantial income to meet their household needs and pay their debts.

At the present time, Schmidt is employed and admittedly doing well enough to receive an annual raise. Schmidt has not maximized his earnings potential and has chosen to stay in the public sector earning less than he might make in the private sector. Although Schmidt does have a heart condition, he has been able to maintain his current employment; the only physical limitation is a limitation on any extra work or stressful hobbies such as go-cart racing. He is six hours short of completing his Masters degree and will potentially gain more experience in his field as time goes on, which will increase his marketability. Even if he chooses to remain in the public sector, Schmidt can expect to earn a reasonable amount of income for a person in his position for the indefinite future. Additionally, when he reaches the age of 60 in twelve years, he will be eligible for a monthly pension of unknown amount through the Kansas National Guard.

■ For reasons that have not been explained and are not clear to the Court, Horner has had some difficulty in holding full-time employment in the last year and is currently unemployed.[5] As a result, the Debtors presently have a budget shortfall of about $1,200.00 a month, and quite clearly are unable to commence making payments on their student loans at this time. However, a review of her employment history shows that Horner has been employed for most of the time during her marriage to Schmidt. The Debtors are accustomed to two incomes to sustain

---

5. Perhaps Horner is simply one of the hundreds of thousands of unemployed persons who are suffering from the current national rescissionary period, and that her prolonged employment has nothing to do with her apparent abilities and qualifications.

their household and it is obviously difficult when one is out of work. However, Horner is actively seeking employment and with her education and employment history there is no apparent reason why she will not be gainfully employed again in a relatively short period of time. Horner is articulate and well educated. She is being diligent in her search efforts and should be hopeful of finding full-time employment commensurate with her education and experience. Considering her education, work experience, and dedication to the job search, the Court is convinced that Horner's unemployment will end in the reasonably reliable future. Debtor's future earning potential as a degreed and experienced professional is the salient factor, and not the fact of a present and temporary unemployment. *In re Frech,* 62 B.R. 235, 241 (Bankr.D.Minn.1986). *See also In re Webb,* 132 B.R. 199 (Bankr.M.D.Fla. 1991)(no additional circumstances existed to indicate a likelihood that current inability to find any work would extend for significant period of time when debtor was not disabled or elderly, and was "educated, experienced, and articulate.").

The *Andrews* test requires this Court to examine whether there will be future income from which to repay student loans. "The fact that a debtor's budget may be tight for the foreseeable future is the norm rather than the exception." *Bakkum v. Great Lakes Higher Educ. Corp. (In re Bakkum),* 139 B.R. 680, 682 (Bankr. N.D.Ohio 1992) (citations omitted). In this case, Horner estimates that she will take home approximately $1,800.00—$2,000.00 per month when she returns to work full-

time. Schmidt anticipates a raise, so his take home pay should increase to around $2,000.00 a month. Thus, together the Debtors' estimated future income could be as high as $4,000.00 per month; based on their earnings history, this is not an unreasonable expectation. Even taking into account the extra childcare costs—which will terminate in a very few years—the Debtors should have between $300.00 and $400.00 a month in disposable income, from which the student loan debts could be paid.

In summary, the Debtors are a well-educated couple with no severe disabilities that would prevent them from both working full-time for the next twenty years. Both Debtors have a long employment history and are capable of sustaining gainful employment. In addition, both have attained advanced degrees which have enabled them to increase their salaries over the years. Their earnings potential for future years is positive and encouraging, and should enable them to make substantial payments on their student loan debts in coming years.

### 2. The Debtors' Necessary Reasonable Living Expenses

■ The Court has examined the Debtors' evidence of their monthly income and expenses as presented at trial.[6] "The bankruptcy court must determine whether there would be anything left from the debtor's *estimated future income* to enable the debtor to make some payment on his/her student loan without reducing what the debtor and his/her dependents need to

---

6. The Court notes that the Debtors testified that there had not been any significant changes since filing their Income and Expense Schedules at the time of the bankruptcy filing in May 2002. However, on cross-examination they testified to several changes in both of these Schedules which the Court will

examine in length to determine the actual income and expenses for this analysis. It is most helpful to the Court in these cases when Debtors come prepared to show the Court their actual income and expenses at the present time.

maintain a minimal standard of living." *In re Wegfehrt*, 10 B.R. 826, 830 (Bankr. N.D.Ohio 1981)(emphasis added).

As stated above, the Debtors stipulate that their monthly income is $1,987.31, as shown on Schedule I of their bankruptcy schedules filed on May 29, 2002. (Ex. 2, p. 81) This income does not include any income from Horner's unemployment and part-time work. Horner testified that she is receiving $250.00 per week in unemployment compensation and approximately $120.00 per month from her part-time work. This adds roughly $1,195.00 [7] to the monthly budget for a total income of $3,182.31.[8] This amount does not account for Schmidt's anticipated annual raise or the fact that he is over-withholding income taxes, resulting in a tax refund every year.

■ In evaluating the expenses, the Court will start with the Debtors' Schedule J and modify it according to the evidence adduced at trial. The rent has increased to $850.00 from $750.00, thereby adding $100.00 to the total expenses. The Debtors testified that they are no longer paying for a cancer insurance policy so the Court will deduct $40.00 for that expense. The Debtors list $15.00 in pet expenses, which is not extraordinary, but the Court finds it incredible that the Debtors continue to keep a cat in the household when the family members are allergic to cats and are spending at least $100.00 per month on allergy medications. The Court finds that this expense is unreasonable and will omit it from consideration. The monthly car payment for two vehicles is $504.76, not the $560.00 listed on the schedule. Horner

testified that the transportation costs are $235.00 per month since she is not working full-time. The Court believes that the telephone expense is high given the availability of long distance telephone cards and cell phone plans with free long distance service and will reduce this amount by half. The laundry bill is higher than usual because the Debtors' washer and dryer are currently not operating. The Expenses as modified by the testimony are set out below:

| | |
|---|---:|
| Rent | $ 850.00 |
| Utilities | 300.00 |
| Water & Sewer | 80.00 |
| Telephone | 40.00 |
| Food | 500.00 |
| Clothing | 50.00 |
| Laundry | 80.00 |
| Medical | 350.00 |
| Transportation | 235.00 |
| Recreation | 80.00 |
| Insurance—renters | 22.00 |
| Insurance—auto | 160.00 |
| Personal property tax & license | 35.00 |
| Car payment | 505.00 |
| Downtown parking | 65.00 |
| | |
| Total Expenses | $3,352.00 |

The Debtors' total income is currently $3,182.31 and monthly expenses total $3,352.00. Therefore, the Debtors have no disposable income with which to make even minimal payments on the student loan debt as long as Horner is unemployed. The Court does not consider the Debtors' living expenses unreasonable, as modified by the Court hereinabove. The difficulty at the *present* time is that Horner is unemployed and has been unemployed for upwards of a year. The *future* prospect is that Horner will be employed full-time, earning a substantial income as

---

7. The Court calculated $250.00 times 4.3 which totals $1,075.00, plus the $120.00 in part-time earnings, to equal $1,195.00 in additional income.

8. Counsel for the Debtors offered the Internal Revenue Service Collection Financial Standards as evidence of what is necessary for a

minimum standard of living. For a family of four, the guideline is $3,016.00 per month. In this case, the argument does not help the Debtors since they have income in excess of this minimum and will have more when Horner returns to work full-time.

in previous years, and that the Debtors will then be able to make some payments on their student loan debt.

### 3. Other Unique Circumstances

■ The third factor of the *Andrews* test provides for consideration of other relevant factors and circumstances that are present in a case. The Court finds that the Debtors failed to present any unique or special issues in this case for the Court to consider.[9] While the family has several health related problems, none of them is so severe as to cause any of the family members a physical or mental disability that warrants consideration as a unique circumstance.

### 4. Totality of the Circumstances

■ The *Andrews* test requires that the Court examine each prong and then determine from the total circumstances whether repayment of student loans will create an undue hardship on the Debtors. The Eighth Circuit specifically held that "if the debtor's reasonable *future financial resources* will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged." *Long*, 322 F.3d at 554. In this case, the Debtors' *present financial resources* do not enable them to make a payment on their student loans. The fact that the Debtors' present financial resources are not sufficient to meet all of their current monthly budget and to repay their student loans at the same time is not dispositive. *Zibura v. Academic Financial Services Association (In re Zibura)*, 128 B.R. 129, 131–32 (Bankr.W.D.Pa.1991). Factors such as debtor's future employment and income, educational level and skills, and the mar-

ketability of those skills are also relevant. *Id.* There is ample reason to believe that the Debtors' future financial condition will improve and that they will be able to pay their student loans without undue hardship. Based on Horner's past work experience, salary history, education, and willingness to work, the Court is convinced that she will be employed in a position that will allow her to add—at the minimum$1,800.00 of income and more likely $2,000.00 per month which would allow for substantial repayment of the student loans in the future while still allowing for a minimal standard of living. Further, the Income Contingent Repayment plan is available to these Debtors, which enables them to make payments based on their income and not on the amount of the debt. The intent of Congress is clear that Debtors are not to be excused from paying their student loans without a showing of undue hardship, not merely a temporary hardship. While it is unlikely that the Debtors will ever be able to repay the entire amount of their student loan debts, it is clear under all the circumstances present here that, over the next several years, the Debtors should be able to repay a significant amount of the debts.

### CONCLUSION

Upon consideration of all of the evidence in this case, the Court finds that the Debtors have not demonstrated that requiring them to repay their student loans, at least in part over the next several years, will create an undue hardship on them.

Therefore, it is

**ORDERED** that the Debtors's Complaint to Determine Dischargeability pur-

---

9. Unique circumstances for purposes of determining undue hardship include physical or mental disability of the debtor or other dire circumstances that are beyond the control of the debtor. *See e.g. Andrews.*

suant to 11 U.S.C. § 523(a)(8) be and is hereby DENIED.