**In re Ronald Willis STRAND, Linda M. Strand, Debtors.**

**Ronald Willis Strand, Plaintiff,**

v.

**Sallie Mae Servicing Corporation, Education Debt Services Incorporated, Illinois Student Assistance Commission, Defendants.**

Bankruptcy No. 96–34055.
Adversary No. 02–9164.

United States Bankruptcy Court,
D. Minnesota.

Sept. 11, 2003.

Janine Steinke Andreasen, Halverson &
Associates, Mankato, MN, for Debtors.

## ORDER DETERMINING
## DISCHARGEABILITY

DENNIS D. O'BRIEN, Bankruptcy
Judge.

This matter came before the Court for
trial on the plaintiff's complaint under 11
U.S.C. § 523(a)(8) seeking to have student
loan debt owed to the named defendants
determined discharged. Mark C. Halver-
son appeared on behalf of the plaintiff,
debtor Ronald Willis Strand. Jennifer M.
Berquist appeared on behalf of defendant
Illinois Student Assistance Commission.[1]
Based on all the files, records and proceed-
ings herein, the Court now being fully
advised makes this Order pursuant to the
Federal and Local Rules of Bankruptcy
Procedure.

I. Factual Findings [2]

Ronald Strand is fifty-four years old,
married, with five independent adult chil-

dren. He graduated from high school in
1967 and entered the Navy. He served in
Vietnam from 1968 to 1971 on a river boat,
during which time he suffered a severe
combat injury for which he spent approxi-
mately four months recovering in Japan
and in the United States before he was
redeployed to service in Vietnam. Physi-
cal effects of his war injury remain today,
including intestinal problems and chronic
arthritis on the right half of his body.
Strand also suffers post traumatic stress
syndrome, or delayed stress disorder, and
from that has long experienced and contin-
ues to suffer various psychological prob-
lems including an unstable temperament,
depression, and frightening illusory per-
ceptions.

When he returned from Vietnam, Strand
worked as a police officer from 1971 until
1973. He was fired from that position as a
result of personality conflicts, attitude, and
inability to follow rules. From 1973–1975
Strand worked part-time for Northstar
Concrete In 1975, Strand attended Jack-
son Vocational School to gain training to
become an electrician. After eighteen
months or so he dropped out of the pro-
gram. He then began a program at Man-
kato State University. In 1980, Strand
completed a bachelors degree in "open
studies," a sort of "design your own de-
gree." Strand's emphasis in his open
studies, to the extent he made one, was
apparently on counseling.

Strand did not find that his degree in
open studies aided him in finding employ-
ment and he thereafter entered law school

---

1. As the guarantor of the student loans at
issue in this case, ISAC purchased the loans
upon Strand's default. Accordingly, the
Court presumes the lack of participation of
the other named defendants is because the
debts have been satisfied as to them by ISAC.
Nevertheless, the complaint was not formally
dismissed as to those defendants and they are
therefore in default.

2. The facts in this case are not in dispute.
The evidence before the Court consists almost
entirely of the testimony offered by Strand,
which the Court deems credible. ISAC chose
not to undertake discovery in this case and
made no objection to any part of Strand's
testimony nor to his proffered exhibits.

at Hamline University in September, 1980.[3] Finding the studies very difficult, Strand did not work while he was in law school. He graduated in 1984, taking a year longer than typical. His class rank was second from the bottom and he spent some of his time in law school on academic probation. Following law school, Strand took and failed the Minnesota bar exam four times. In July 1984 and February 1985, Strand took the classroom and audio-cassette bar exam preparation courses but failed nevertheless. The third time he took the bar exam he prepared with the classroom, audiocassette and video courses, but he still failed. He learned in 1987 that he suffered from the learning disability dyslexia.[4] For his fourth attempt at the bar exam, Strand apparently requested but was denied an accommodation for his dyslexia for taking the bar exam. Nevertheless, he again took the classroom, audiocassette and video bar exam preparation courses as well as retained a tutor, but he still failed the exam. In order to sit for the exam again, Strand would have to be granted a special dispensation. Even if he were permitted to take the exam again, Strand does not believe he could pass it because he has been completely away from legal studies for more than a decade.

In the autumn of 1985, Strand returned to Mankato State University, where he completed in 1987, with difficulty and poor grades,[5] a masters degree in urban stud-ies. He tried thereafter to obtain employment in city planning, but had no success. Strand did not give up the education track, however. From 1988–1991 he pursued another masters degree, this time in corrections and sociology. At the same time he earned a meager and intermittent income providing auto body services out of his back yard. He completed everything required for the masters in corrections and sociology except the thesis. He unsuccessfully argued that a five page document presented in a VFW publication was sufficient to constitute his thesis. Upon losing this argument, he gave up completing the masters degree. He also gave up the auto body business because he began experiencing respiratory problems as a result of excessive exposure to paint

His course work in corrections, however, helped Strand gain employment as a juvenile probation officer for the State of Minnesota in 1992. He earned a salary in the approximate amount of $25,000 annually, and remained in this position for two years. Strand left the position on the recommendation of, indeed on the order of, his family physician, Dr. Jaspers, who cautioned Strand that the stress of the probation job was more than his high blood pressure could tolerate any longer.[6] Dr. Jaspers had diagnosed Strand's hypertension several years earlier, and it apparently peaked around 1994.

Following the probation officer position, Strand tried driving a school bus, but it

---

3. It was around this time that Strand was first determined to suffer from post traumatic stress. He was treated by two different psychologists during the eighties, and continues to be treated with counseling, as well as with medication for depression.

4. According to Strand, dyslexia causes him to read numbers and letters inverted, and causes him to require a considerably lengthier amount of time to complete tasks that involve reading than the same task would take a person without dyslexia.

5. Strand completed the thesis over a one-year period, re-writing it many times and finally preparing it for submission with his wife's critical and editorial assistance.

6. At that time Strand's blood pressure was apparently extremely high, perhaps as high as 260 over 210, even while taking medication to reduce it.

also proved too stressful for him. Then Strand began working for a trucking company. He drove semis until December, 1998, when he suffered a heart attack followed immediately by quadruple bypass surgery. After this health incident Strand was essentially disqualified from truck driving as he cannot obtain the health certificate required for the job. In addition, the bypass surgery left Strand with a number of disabling side effects including constant angina/intense chest pain, shortness of breath, restriction from lifting anything heavy, and inability to sit or stand for an extended amount of time. His sternum has failed to heal following the surgery and is held together by interior medical devices, and hypertension continues to be a problem. Strand takes no less than eleven medications each day to address his heart disease, diabetes, arthritis, diarrhea, depression, and to control side effects and deficiency resulting from some of the medicines. In addition, he regularly requires prescription-strength pain relief. Strand's heart disease has not abated and he expects to have to undergo bypass surgery a second time within a few years.

Nevertheless, Strand continued to seek employment and was hired in January, 1999, by Adult Child and Family Services for the part-time position of mental health practitioner serving as a mentor and advocate for abused children. Strand continued in this job until approximately July, 1999, when the position was eliminated. He has since applied for as many as two dozen like positions, without success.

In 2001, Strand purchased, on credit, $9,000 in snap-on-tools in furtherance of possibly starting to provide an auto body service again. He found no clientele and that his ability in the automotive area was limited and out-of-date. However, Strand secured employment as a bail bondsman for Absolute Bail. The job was ideal for Strand because it was low stress, required minimal interpersonal confrontation, inherently provided a flexible schedule, and required no heavy lifting or health certification. As a subcontractor, Strand was paid on commission and managed his own expenses, including collect phone calls from the incarcerated individual seeking bail, and mileage driving to jails and sometimes to court in six different counties ranging from 10–55 miles from his home. Approximately one third of Strand's gross income as a bail bondsman went to his expenses.[7] In May 2003, Strand was laid-off due to restructuring at Absolute Bail. Strand has since sought employment without success. At the time of trial, Strand remained unemployed.

Strand consolidated his student loans in 1995. In all the time since he began borrowing student loans in approximately his second year of law school, he has made just eight payments. For most of the rest of the time, however, he was in a granted nonpayment status, such as a medical or income-based hardship forbearance, or an in-school deferment. Strand has applied for a federal hardship discharge of his student loans on the basis of total permanent disability. His application is physician certified by one of his psychologists, Dr. George Komaridis, who noted on the application that Strand suffers from chronic post traumatic stress disorder which "adversely affects social relationships and ability to get along with people or organizations," and which has "resulted in job losses and work difficulties." Strand's application for a hardship discharge was submitted just before trial and a decision was

---

7. Strand's gross income as a bondsman for Absolute Bail was approximately $12,000 in 2001; $20,000 in 2002; and approximately $7,000 in 2003 through May when he lost the job.

therefore not yet rendered at the time of trial.

Strand and his wife's combined expenses presently total $4,350 monthly:

| | |
|---|---:|
| mortgage, home insurance, property taxes: | 1245.00 |
| electricity and fuel: | 350.00 |
| telephone and internet: | 150.00 |
| garbage: | 25.00 |
| cable: | 40.00 |
| home maintenance: | 200.00 |
| food: | 275.00 |
| clothing: | 50.00 |
| laundry/cleaning: | 20.00 |
| medical/dental: | 250.00 |
| transportation: | 300.00 |
| charitable contributions: | 50.00 |
| life insurance: | 70.00 |
| health insurance: | 95.00 |
| auto insurance: | 180.00 |
| auto payments: | 800.00 |
| lease overage payment: | 250.00 |

Of these expenses, most are ordinary and modest. The mortgage payment is the result of two mortgages totaling approximately $115,000 against a modest, rural property valued at between $125,000–140,000. The mortgage has 28 years left in repayment. The fuel expense represents an average monthly cost of gas and electricity over a year. The home maintenance expense represents the usual costs of keeping up basic repairs in an older home, including, in this case, ongoing pervasive roofing problems. The food expense is reasonable on its face and probably understated, as are the basic clothing and laundry expenses. Likewise, the monthly medical/dental expense listed at $250 above and beyond the insurance premium constitutes the average monthly cost of noncovered (deductible) costs such as copays and prescriptions for both Strand and his wife. Similarly, the life insurance carried by Strand on himself in favor of his wife is, although a whole life policy, of little cash value being relatively new.

The apparently questionable expenses are easily explained, and are or were justified under the circumstances. The telephone and internet costs were a result of Strand's employment as a subcontracted bail bondsman. Similarly, the transportation costs were a result of excessive mileage associated with the bondsman job, as well as increased maintenance on the vehicle driven by Strand. The car payments are high because the two cars were purchased new in 2000 and 2001, reflecting the Strands' decision to undertake car payments on new and warrantied automobiles rather than undertaking the expenses of repairs and maintenance on top of smaller loan payments for used vehicles. Neither vehicle is worth what is owed on it. The auto insurance reflects full coverage required by the insurer because the cars are financed, and the lease overage payments resulted from a penalty assessed when Strand returned a leased vehicle with excessive mileage due to the extensive driving occasioned by his work.

Strand's wife was a registered nurse at a psychiatric hospital. As a corrections employee, however, she was required to retire in August 2002 at the mandatory retirement age of fifty-five. Her retirement income is $1,905 gross monthly, with approximately one-third withheld for taxes. When she becomes eligible for social security benefits, her retirement will be reduced by the amount of her social security. Accordingly, unless she starts working again, her income will remain steady for the foreseeable future. Strand's wife has an IRA containing approximately $2,000. Other than that, neither Strand nor his wife have any other sources of income or other assets.

Now that Strand is not a bail bondsman, it can be reasonably anticipated that his transportation expenses will be significantly reduced. The Strands will likely lose the vehicles because, at the time of trial, they were already three months behind in payments. They will have to drive something however, no matter what employment Strand ultimately finds, because they live in a rural area, and so there will surely

be the necessity of some vehicle payment and the associated higher insurance cost Nevertheless, the gas and maintenance expenses may be substantially reduced. Similarly, unless Strand regains employment as a bondsman, his expenses for telephone and internet will likely be significantly less. Payments on the snap-on-tools are also far behind and Strand expects the tools to be repossessed soon. At best then, that is *very optimistically,* Strand's actual, reasonable and necessary expenses for himself and his wife may be as little as $3,250.00 assuming these possible reductions.

The debtors Ronald and Linda Strand filed the underlying voluntary Chapter 7 bankruptcy case on July 23, 1996. The plaintiff debtor Ronald Strand filed this adversary proceeding on December 20, 2002, seeking a determination that his student loan debt is dischargeable pursuant to 11 U.S.C. § 523(a)(8) and that the debt was therefore not excepted from the discharge granted in the main bankruptcy case under § 727. The defendant, ISAC, argues that Strand has never made a good faith attempt at repayment, that his claimed difficulties are inconsistent with his accomplishments, that excepting the debt from discharge would not constitute an undue hardship upon the debtor, and that in any event the federal income contingent repayment plan would eliminate any hardship. At present, Strand owes approximately $130,000, just slightly more than half of which constitutes the total principal amount borrowed.

## II. Discussion

Section 523(a)(8) provides, in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

*See* 11 U.S.C. § 523(a)(8).

■ Quite recently, as this Court well knows, the Eighth Circuit Court of Appeals unequivocally upheld the totality of the circumstances test as the only permissible test, in this Circuit, for undue hardship under § 523(a)(8): "[W]e reaffirm the totality-of-the-circumstances test as set forth in *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews),* 661 F.2d 702, 704 (8th Cir.1981)." *See Long v. Educ. Credit Mgmt. Corp. (In re Long),* 322 F.3d 549, 553 (8th Cir.2003). "We prefer a less restrictive approach to the 'undue hardship' inquiry." *Id.,* citing *Andrews,* 661 F.2d at 704. "We are convinced that requiring our bankruptcy courts to adhere to the strict parameters of a particular test would diminish the inherent discretion contained in § 523(a)(8) ... we continue—as we first did in *Andrews*—to embrace a totality-of-the-circumstances approach to the 'undue hardship' inquiry." *Id.* at 554. "We believe that fairness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy." *Id.*

As a preliminary matter then, there need be no discussion of other tests from other jurisdictions as there can be no doubt about what is the proper analysis to

be made here. "In *Long*, the Eighth Circuit abjured the bankruptcy courts to eschew the several variant tests framed by other courts, trial and appellate, and to apply the 'less restrictive approach' of *Andrews*, the totality-of-the-circumstances test." *See Lieberman v. Educ. Credit Mgmt. Corp. (In re Lieberman)*, 2003 WL 21397713 n. 10 (Bankr.D.Minn.2003). "[A]rgument based on any test other than the *Andrews/Long* one is not to be recognized." *Id.*

■ The totality of the circumstances test for undue hardship under § 523(a)(8) requires the Court to consider three elements:

1) the debtor's past, present, and reasonably reliable future financial resources, including assets, expenses, and earnings and the prospect of future changes—positive or negative—in the debtor's financial position;

2) the debtor's and the debtor's dependents' reasonable necessary living expenses; and

3) any other relevant facts and circumstances surrounding each particular case.

*Long*, 322 F.3d at 554–555; citing *Andrews*, 661 F.2d at 704; *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 132 (8th Cir. BAP 1999).

■ "Unique circumstances for purposes of determining undue hardship include physical or mental disability of the debtor or other dire circumstances that are beyond the control of the debtor." *See Schmidt v. SLM Corp. (In re Schmidt)*, 294 B.R. 741, 751 n. 9 (Bankr.W.D.Mo. 2003), citing as an example *Andrews*, 661 F.2d 702.

■ "The debtor bears the burden of proving undue hardship by a preponderance of the evidence." *See Korhonen v.*

*Educ. Credit Mgmt. Corp. (In re Korhonen)*, 296 B.R. 492, 495 (Bankr.D.Minn. 2003), citing *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 292 B.R. 635, 638 (8th Cir. BAP 2003).

■ Strand's case is not a close case; from every perspective it would be an undue hardship to except his student loan debt from discharge. As to the first element, the debtor's past, present and reasonably reliable future financial resources, only one conclusion can be reached and that is the one Strand has demonstrated all of his adult, non-military life. He has never maintained reliable financial resources, much less accumulated a surplus. He has not maintained regular employment ever, not even across varying disciplines and not even with some peculiarly tailored education. He has never earned enough income to service the debt at the amount at which his student loans stand due today. He has only earned enough income to make payments on the student loans a handful of times in over twenty years.

As to present financial resources, Strand has none. He has only obligations far in excess of what his historically highest income could have supported. His future financial resources are not uncertain; they are patently bleak. He has never been able to apply his legal education, and, after reaching the maximum number of bar examination failures and after almost two decades of no form of law-related employment since graduating law school at the bottom of his class, it is unlikely that his law degree will ever serve him financially. His open studies and urban studies degrees never aided him in obtaining employment, perhaps because of his poor grades or perhaps because of the job market, and there is no reason to imagine that those old, uncultivated degrees will suddenly become an asset. His incomplete

degree is not a degree in the sense of being an aid to gaining employment.

Strand's experience, relatively recently, as a mental health practitioner is probably his best asset and his best hope for similar future employment. However, at the time of trial he had already made expansive efforts job searching in that direction with no success. Even assuming he is recalled as a bail bondsman, the expenses of that occupation are substantial, and he is behind in servicing the debt on the automobile required for that kind of work. Even if Strand's and his wife's reasonable and necessary expenses were reduced to $3,250, which is more than a stretch, and even assuming that Strand could somehow manage to bring home $1100 net each month, as he did only from time to time during his best periods of employment, monthly expenses would still exceed combined monthly net income by at least $245.

Moreover, not one of these hypothetical arrangements has any basis in reality because Strand is overwhelmed with "other circumstances." His mental disabilities range from learning challenges to serious psychological problems. His physician certified that Strand suffers from post traumatic stress disorder to the extent that it interferes with his social relationships and his ability to function in and hold a job. His physical health problems are also troubling from the perspective of employment. He suffers from depression. He cannot lift, sit, stand, or drive. He is in constant pain from angina and arthritis. He has a restricted diet as a result of diabetes and chronic diarrhea. His disability is manifest without even considering the job limitations imposed as a result of his physical and mental inability to cope with stressful settings or situations and social conflict. For these reasons, even assuming reduced expenses, regained employment, and even adding the possibility

of the Strands selling their home and finding an apartment somewhat less expensive than their present mortgage, Strand's prospects of ever earning enough to afford any meaningful payment on his student loan debt is hopeless.

■ ISAC argues that Strand's pattern of going back to school for additional advanced degrees demonstrates his disregard for the loan obligations and a lack of good faith in repayment of the loans. Moreover, ISAC claims, his earning advanced degrees is not consistent with his purported learning disabilities and psychological problems. The Court disagrees. Strand kept going back to school precisely because he believed it to be the best route to reliable future financial resources. Unfortunately, his dyslexia made formal education more difficult for him and so, although he completed some of the programs in which he enrolled, his academic performance was poor. His psychological problems, and his growing physical medical problems, made the employment he did obtain contentious and short-lived.

Finally, ISAC argues that, if Strand would participate in the direct lending program, there would never be an occasion under which his repayment obligation would constitute an undue hardship because his payment would be directly tied to his income. There is no evidence in the record before the Court regarding the workings of the income sensitive repayment program to which ISAC referred, though counsel for ISAC argued to the Court that under such a plan Strand would pay as little as zero for twenty-five years of continuing liability and accruing interest on the debt after which time any remaining debt would then be forgiven. In *Korhonen,* the Court described the same or a similar program:

The Income Contingent Repayment Program permits a student loan debtor to pay twenty percent of the difference between his adjusted gross income and the poverty level for his family size, or the amount the debtor would pay if the debt were repaid in twelve years, whichever is less. Under the program, the borrower's monthly repayment amount is adjusted each year to reflect any changes in these factors. The borrower's repayments may also be adjusted during the year based on special circumstances. See 34 C.F.R. § 685.209(c)(3). At the end of the twenty five year payment period, any remaining loan balance would be cancelled by the Secretary of Education. However, the amount discharged would be considered taxable income.

*Korhonen*, 296 B.R. at 496 (citations omitted).

Indeed, the Eighth Circuit in *Long* stated: "Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged." *Long*, 322 F.3d at 554–555. Therefore, according to ISAC, if there is a repayment plan that allows for a flexible payment that is dependent on the debtor's circumstances, then it would not be an undue hardship for the debtor to be required to remain liable on the student loans.

■■■ The Court disagrees with that proposition as a bright line rule. Instead, such a plan is something to consider, when the evidence of such a program and its availability and impact upon a given debtor is made clear in the record, and when the debtor's reliable future financial resources, reasonable and necessary expenses, and other circumstances are not otherwise overwhelmingly determinative in any

event. To give an income contingent repayment plan more weight than the other factors underlying the totality of the circumstances analysis would unhinge the Eighth Circuit's clear mandate for an individualized and less restrictive undue hardship inquiry in the matter of the nondischargeability of student loans, and likewise undermine the fundamental bankruptcy policy of the fresh start.

The defendants' argument is nothing less than a per se rule that there can never be a discharge of a student loan for an undue hardship where the debtor is eligible for the Income Contingent Repayment Plan. This cannot be right. The Income Contingent Repayment Plan cannot trump the Congressionally mandated individualized determination of undue hardship. The Income Contingent Repayment Plan is but one factor to be considered in determining undue hardship, but it is not determinative.

*Korhonen*, 296 B.R. at 496 (citations omitted).

Besides, there are undue financial burdens that could arise, and in this case almost certainly will arise, separate from the hardship of actually making a payment into the plan. Even, or indeed especially, in the event of a debtor's fruitless zero-payment-required participation in such an income contingent repayment program, the derivative financial woes would be significant. With interest accruing for twenty five years, and very little or absolutely no payment against the principal, Strand would be hamstrung into poverty for the rest of his life. He would be precluded from obtaining any credit, and perhaps even from obtaining approval of a rental application. He would grow hopelessly more insolvent, with no realistic possibility of ever retiring the debt. Finally, at the age of 79, the debt would be forgiven and he would be assessed an enormous income

tax liability, probably nondischargeable in bankruptcy. "The loans would haunt him for twenty five years and then create an income liability he could not pay." *Korhonen*, 296 B.R. at 497.

On the contrary, what the Eighth Circuit said in Long is: "[I]f the debtor's reasonable future financial resources will sufficiently cover *payment of the student loan debt*—while still allowing for a minimal standard of living—then the debt should not be discharged." *Long*, 322 F.3d at 554–555 (emphasis added). The Eighth Circuit did not say nonpayment, or zero payment, or payment toward accumulating interest only on the debt. This Court understands that by "payment of the student loan debt," the Court of Appeals meant what it said, that is, payment of the underlying outstanding debt itself Such an interpretation is likewise consistent with the legislative history behind restricting the dischargeability of student loans. The policy of § 523(a)(8) is clear: "Congress intended to prevent recent graduates who were beginning lucrative careers" from escaping their student loan obligation. *Long*, 322 F.3d at 554. "[B]ankruptcy relief is designed to give the honest but unfortunate debtor a fresh start, and although government guaranteed student loans are meant to be more difficult to discharge than general unsecured debts, they are not meant to be impossible to discharge." *Korhonen*, 296 B.R. at 497 (citations omitted).

Strand is not, unfortunately, about to embark on any lucrative career now or in the foreseeable future, not as a result of his education nor by some other chance. With persistence and some good luck, Strand will obtain some type of employment suitable for his skills and experience as well as accommodating to his psychological, social, and physical medical disabilities and his dyslexia. Strand cannot, however, in any realistically possible way, expect from his present and reasonably reliable future financial resources to eventually retire his student loan debt and at the same time maintain at least a minimal standard of living. *Long*, 322 F.3d at 554–555.

### III.   Disposition

For the reasons set forth above, IT IS HEREBY ORDERED:

1.  To require the debtor Ronald Willis Strand to repay the student loan debt at issue in this adversary proceeding would impose an undue hardship upon him pursuant to 11 U.S.C. § 523(a)(8); and

2.  The student loan debt owed by the debtor Ronald Willis Strand to Sallie Mae Servicing Corp., Education Debt Services, Inc., and Illinois Student Assistance Commission, is dischargeable pursuant to 11 U.S.C. § 523(a)(8) and was not excepted from the general discharge entered in the bankruptcy case 96–34055.

LET JUDGMENT BE ENTERED ACCORDINGLY.