**In re Carol Ann RACE, Debtor.**

**Carol Ann Race, Plaintiff,**

**v.**

**Educational Credit Management Corporation, Diversified Collection Service, and Texas Guaranteed Student Loan Corporation, Defendants.**

**Bankruptcy No. 02–60341.**
**Adversary No. 02–6047.**

United States Bankruptcy Court,
D. Minnesota,
Sixth Division.

Jan. 26, 2004.

Allen Haugrud, Fergus Falls, MN, for Debtor.

## ORDER FOR JUDGMENT

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter came before the Court for trial on the complaint of the plaintiff-debtor seeking to have student loan debt determined an undue hardship and discharged pursuant to 11 U.S.C. § 523(a)(8). Allen Haugrud appeared on behalf of the plaintiff, debtor Carol Ann Race; Christopher McCullough appeared on behalf of defendant Educational Credit Management Corporation; and James MacGillis appeared on behalf of Texas Guaranteed Student

Loan Corporation.[1] At the conclusion of the trial, the Court took the matter under advisement.

Based on all the files, records and proceedings herein, the Court having reviewed the evidence presented and arguments made, and being now fully advised in the premises, makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure. For the reasons set forth below, the Court finds that excepting from discharge the student loan debt at issue in this proceeding will not constitute an undue hardship to the debtor and her dependents and, accordingly, judgment will be entered in favor of the defendants.

## I. FINDINGS OF FACT

The plaintiff, debtor Carol Ann Race, graduated in 1985, *cum laude,* from the College of St. Thomas with a Bachelor of Arts in theology and philosophy. In 1990, Race graduated, *cum laude,* from the University of Fribourg, Switzerland with a Licentiate in Sacred Theology. Race financed her higher education in part by borrowing pursuant to student loan programs. In 1980, Race borrowed principal amounts of $1,500.00 and $1,000.00. From 1981 to 1984, Race borrowed principal amounts of $2,500.00 once each year. The outstanding debt remaining as of November 18, 2003, including interest, arising from the six 1980 to 1984 loans, is $22,983.37, and is owed to defendant Educational Credit Management Corporation (ECMC). In 1987 and 1988, Race borrowed principal amounts of $2.500.00 three times. The three 1987 and 1988 loans

were consolidated on or about January 30, 2002. The total consolidated debt outstanding as of November 18, 2003, including interest, arising from the three 1987 and 1988 loans, is $10,925.10, and is owed to defendant Texas Guaranteed Student Loan Corporation (TGSLC).

Race is 41 years old, married, and a mother of five children aged 3, 5, 7, 9, and 10. She was last employed outside the home in May, 1994. She is in good health, and has no diagnosed physical or mental disabilities. She is intelligent, articulate and resourceful. Race's husband, John, is employed as a certified resident assistant at the Staples Care Center where he has worked for seven years. He works 32 hours each week, which is deemed fulltime, and earns approximately $1,518.00 net monthly. For the last six years, the Races have received combined federal and state income tax refunds ranging from approximately $3,800 to $5,100. They also receive medical assistance, energy assistance, and $100 to less than $200 in food stamps each month.

John Race has numerous mental health problems. He has been diagnosed with Attention Deficit Disorder (ADD), mood disorder, and a form of high-functioning autism known as Aspergers. With the exception of his current employment, John has a history of not being able to maintain employment and never making more than $10,000 gross income in any year. He has expressed on occasion the desire to terminate his present employment because it is stressful, but Carol has talked him out of it by convincing him of the absolute necessity

---

1. Defendant Diversified Collection Service (DCS) was the collection agent for Great Lakes Higher Education, one of the defendants captioned in the original complaint. By Order of this Court dated November 19, 2002, Educational Credit Management Corporation (ECMC) was substituted for Great Lakes Higher Education. The Great Lakes/DCS debt is an obligation of the plaintiff-debtor to ECMC and, accordingly, DCS does not appear to be a real party in interest to these proceedings and the complaint is hereby dismissed as to DCS.

of his ongoing stable employment. John also has physical problems described by Carol as severe "gut issues," requiring a special diet, regular medical supervision, and nutritional supplements. John is a loving and devoted husband and father, but because of his mental disabilities he is unable to provide basic satisfactory parenting to any of his children independently for any meaningful length of time.

That said, John is not the central challenge of Carol's life, not financially and not emotionally. On the contrary, the work he manages to maintain and the income he sustains is a critical family asset because he could not meet the responsibilities that Carol must meet. Three of the Race children, daughters Chiara, Andrea and Felicia, do not suffer any physical or mental impairments. The Race sons Joshua and Adam, however, are both diagnosed with autism. The boys each earn social security disability income of $6,624 annually, or approximately $552 per month each.

Joshua, almost 11 years old, is a "high functioning" child. After a great deal of research and intervention on the part of his mother, Joshua has managed to successfully attend school. He learns well, demonstrates relatively high academic skills, but suffers nevertheless from a variety of social and emotional, as well as organizational, challenges. Since he has moved from private to public school, Joshua he had less direct assistance and his academic performance has fallen. He continues to have difficult social issues, and it is likely that it will be necessary for the Races to enroll Joshua back into the parochial school where he enjoyed more success. Joshua also received specialized medical care. He suffers from a host of allergies, and requires a special diet and supplementation to prevent him from being malnourished.

Adam, the Race's 9 year old son, suffers from severe autism, at quite the complete opposite end of the spectrum from his brother. He is almost completely non-verbal, requires 24–hour supervision, is prone to running away, has virtually no "normal" social ability, and is easily emotionally overwhelmed by most situations. He also requires specialized medical treatment. Unlike Joshua, Adam cannot function in any kind of a school environment. After many well thought out attempts over the course of two years, and with her constant presence, assistance, and intervention, Race decided the best option for Adam was home-schooling. Race has educated herself as extensively as possible short of actual schooling or training, including attending formal workshops about various aspects of autism and what to do for a child with autism. She faced a host of obstacles from the traditional and special education programs alike, both public and private. Rather than any benefit to Adam, his two years of school proved difficult, unhelpful, and sometimes counterproductive, except to the extent of all that Race was .able to glean from the experience as his primary caregiver.

It is unlikely that Adam will progress to the point of being able to live independently, though the Race family maintains hope and puts forth all available efforts for the best possible progress. At this point, the Races would like to keep Adam from requiring an out-of-home placement, and Carol Race views Adam as her primary responsibility for the rest of her life. He recognizes only a few words, and has uttered just a few recognizable sounds. His best achievements with language have been on horseback, during a process known as therapeutic horseback riding. At first, the Races took Adam to a formal program, but later decided they could obtain better results for Adam providing the experience themselves. They therefore

bought undeveloped farmland property on which the whole family could ride, and upon which the Races hope to eventually construct a new home with better accommodations specific to the size and special needs of their family.

Presently, the Races own a three bedroom home in Bertha, Minnesota, in which the family has resided since October, 1996 (the homestead). The home was worth approximately $52,000 as of last February, 2003. It is encumbered by a mortgage with a balance of $12,933.25, presumably somewhat less now as that figure is also approximately one year old. Accordingly, the Races have something near $40,000 of equity in the homestead. The payments on the homestead are $443 each month. The home is small for the Race family size and their usual and special needs, and there are code violations about which something will have to be done in the very near future. Carol Race has considered moving, but has apparently has been unable to locate a suitable, affordable replacement home. She prefers the idea of building just the right house, albeit with resources obtained at the most minimal possible expense. She intends to use recycled building materials, for example, and learn to do the electrical wiring herself.

The forty acres of undeveloped agricultural land in Todd County (the property) was worth approximately $16,000 almost a year ago. The balance due on the property, as of February 26, 2003, was $15,129.27. The payments started out at $208 each month; however, they Races recently refinanced the property in July, 2003, and now the payments have increased and are $300 each month. At the time of refinancing the property, the mortgage balance was $14,685.41. As a result of refinancing the property, the Races received a cash distribution of $5,314.59.[2] Accordingly, the property had appreciated and the Races collected that appreciation in cash. Presumably the value of the property now is right around $20,000, with little or no equity.

The monthly household expenses of the Race family are approximately $2,362, probably more in reality because some are questionably understated or missing.[3] With monthly income, including from John's employment and the boys' SSDI, of $2,622 total, a monthly surplus of $260 is available, at least on paper. No single item in the Race family budget, except the property, is inflated or unnecessary, including the $400 monthly expense for nutritional supplements. With the added income from tax refunds, and with funding to periodically employ personal care assistants to help with the boys,[4] the Race family just manages to make ends meet.

2. The Races used this money mostly to pay off a credit card, the total debt on which accumulated over the course of a year or so as a result of basic needs purchases. Race also paid for car repairs, as well as auto and home insurance premiums, with a small amount of the refinance proceeds.

3. For example, a budget of $600 per month for groceries for a family of seven, especially with special dietary needs, is likely to be difficult to sustain, even with the additional food stamps resource. Also, no allowance is made in the budget for clothing, a substantial cost for a family with five growing children, even recognizing the use of hand-me-downs

and strictly discount and thrift store shopping. No allowance is made for the cost of parochial private school tuition either, which is a likely and reasonable future expense (for Joshua) of some substance even if financial aid from the school is available.

4. The Race family receives substantial funds for this purpose, based on recurring evaluations and certification of Joshua's and Adam's special needs. Carol Race completes the necessary paper to obtain the funds and hires part-time care providers for activities such as, for example, swimming lessons/therapy for the boys, to assist with personal care in the home, or to purchase helpful equipment.

Race brought this action seeking to have her student loan obligations discharged on the basis that to except the student loan debt from discharge would impose an undue hardship upon her and her dependents. She claims that: (1) working outside the home now is not a reasonable, affordable, sensible or otherwise viable option under the circumstances and that is unlikely to change in the foreseeable future; (2) her husband cannot increase how much he works nor reasonably expect his income to meaningfully increase in the foreseeable future; (3) her husband cannot reasonably be expected to care for their children in her stead in order that she may go out into the workforce in his stead; (4) they cannot afford the payments on her student loans; and, finally, (5) she has no hope of ever retiring her student loan debt.

ECMC and TGSLC argue that Race's budget could be trimmed and that in any event she has several payment options with regard to the student loans, including, among other things, refinancing the homestead in order to obtain the equity as cash, selling the undeveloped property, or consolidating the loans and selecting one of several different repayment plan options. The Court finds that the record unequivocally supports Race's first three contentions, but that the evidence also demonstrates that the Race family income and assets can service the student loans, and eventually put it to rest, without undue hardship.

## II. DISCUSSION

Section 523(a)(8) provides, in pertinent part:

These funds have a narrow and special purpose, and are not used for the usual expenses of typical and basic family life. The Court does not find it appropriate to consider such funds in its analysis of the Race family's fi-

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

*See* 11 U.S.C. § 523(a)(8).

■■■ "A determination of undue hardship under § 523(a)(8) is an issue of law." *See Reynolds v. Pennsylvania Higher Education Assistance Agency (In re Reynolds)*, 303 B.R. 823, 2004 WL 63477 (Bankr.D.Minn.2004), citing *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 553 (8th Cir.2003). "In this Circuit, this issue requires an examination of the facts and circumstances that bear on the debtor's ability to make payment on account of the educational loans in question, and that otherwise go to the issue of hardship." *Id.*, see also *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir. 1981). "[F]airness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy." *Id.* at 554. The Court must weigh all influential conditions unique to the debtor and finally

nancial situation, except to note that to a limited extent the Races are not completely alone in meeting the numerous and varied special needs of their autistic sons.

rely on the totality of those circumstances to determine the question of undue hardship.

■ "As the proponent of an exception to the exception from discharge, the Debtor has the burden to prove her entitlement to it." *See Reynolds,* 2004 WL 63477, citing *In re Ford,* 269 B.R. 673, 675 (8th Cir. BAP 2001); *In re Svoboda,* 264 B.R. 190, 194 (8th Cir. BAP 2001); *In re McCormick,* 259 B.R. 907, 909 (8th Cir. BAP 2001); *In re Cline,* 248 B.R. 347, 351 (8th Cir. BAP 2000).

■ The totality of the circumstances test for undue hardship under § 523(a)(8) requires the Court to consider three elements:

1) the debtor's past, present, and reasonably reliable future financial resources, including assets, expenses, and earnings and the prospect of future changes—positive or negative—in the debtor's financial position;

2) the debtor's and the debtor's dependents' reasonable necessary living expenses; and

3) any other relevant facts and circumstances surrounding each particular case.

*See Long,* 322 F.3d at 554–555; citing *Andrews,* 661 F.2d at 704; *Andresen v. Nebraska Student Loan Program. Inc. (In re Andresen),* 232 B.R. 127, 132 (8th Cir. BAP 1999); *Strand v. Sallie Mae Servicing Corp. et al. (In re Strand),* 298 B.R. 367, 374 (Bankr.D.Minn.2003).

■ The first problem in this case is the Race family budget. Even accounting for the fact that to some unknown degree the expenses are understated, a surplus still seems to exist, especially when including annual income tax refunds. While it is true that Mr. Race can expect to gradually earn more over the years and that the tax refunds may decrease accordingly, those periodic future alterations will not only be incrementally minimal, but they should be on balance as well. Nevertheless, the tax refunds are sizeable. While the Court does not find that the numbers alone are dispositive in the matter, they are significant and highlight the importance of accurate accounting of all necessary expenses in this context.

The second problem is that the student loan debt is not overwhelmingly huge so as to preclude any hope of retiring it, and Race has several repayment options from which to choose. The total is presently approximately $34,000. Under the Extended Repayment Plan available to Race, her payment on the ECMC and TGSLC loans, assuming they were consolidated, would be $262.89 per month. Similarly, under the Graduated Repayment Program, Race's initial monthly payment would be $197.80. However, the graduating system contemplates increasing payments over the years.[5] While the persuasive evidence at trial was a compelling testament to scarcity, shortage, and creative shoe-string financial resourcefulness, the Court finds that Race nevertheless has the assets and income necessary to satisfy her student loan debt.

■ The major problem in this case is the undeveloped real property, both an asset by any definition and, in these facts, a sizeable monthly expense. The question is whether or not it is a required part of the minimal standard of living to be reserved for Race and her family. Indeed,

---

**5.** Race would also qualify for the income Contingent Repayment Program. However, due to the long-term nonpayment on the debt under that plan, the ongoing accrual of interest, the tax implications in the event of an eventual forgiveness, and the long-term impact on creditworthiness, the ICRP is not a viable option for Race.

the § 523(a)(8) undue hardship exception to the student loan exception is premised upon protecting the debtor and the debtor's dependents from suffering to exist at something less than a basic needs level. An extra piece of undeveloped property bleeding the family financial coffers a substantial sum each and every month must, in this context, have a primary causal role in the provision and maintenance of the minimal standard of living protected by the Bankruptcy Code.

■ "Passing on questions of law requires the drawing of a line, the application of a standard enunciated in the law to a particular set of facts." *See Reynolds*, 2004 WL 63477. "Here the line is marked by the statutory modifier 'undue.' " *Id.* (citations omitted). "The Eighth Circuit clearly expects the 'undue' criterion to resonate with financial circumstances—specifically, the residual ability to make payment from current income once a baseline of reasonable but frugal household expenditure is established." *Id.*, citing *Long*, 322 F.3d at 554–555; *Andrews*, 661 F.2d at 703; *Andresen*, 232 B.R. at 140.

■ "However, the *Andrews/Long* formulation includes a catch-all for all other relevant facts—and those opinions' language does not limit them to financially-based ones." *See Reynolds*, 2004 WL 63477. "Though the choice and weighting of such non-pecuniary factors are ultimately subject to de novo review by an appellate forum, *Long*, 322 F.3d at 553, the trial court clearly may take them into consideration." *Id.* "Otherwise, the Eighth Circuit's repeated references to a broad 'totality-of-the-circumstances' approach to the 'undue hardship' inquiry ... would be rendered nugatory." *Id.*, citing *Andresen*, 232 B.R. at 140; *Strand*, 298 B.R. at 376. "Unique circumstances for purposes of determining undue hardship include physical or mental disability of the debtor or other dire circumstances that are beyond the control of the debtor." *See Schmidt v. SLM Corp. (In re Schmidt)*, 294 B.R. 741, 751 n. 9 (Bankr.W.D.Mo.2003), citing as an example *Andrews*, 661 F.2d 702.

In this case, and with respect to the property, the unique circumstance is Adam and the success, not achieved by any other activity, that he enjoys developmentally on horseback. The Court does not discount the importance of Adam's basic and special needs nor the unmatched value to him of horseback riding. Nevertheless, the property is not a requirement for that experience. He began this type of therapy in another fee-for-service type program not located on the property. The opportunity will not disappear if the property is sold. The Court does not doubt Race's ability and determination to find another way for Adam to be able to ride, and even to ride alongside her instead of with a therapist. The Court finds that the property is not essential for the purpose of providing therapeutic horseback riding opportunities for Adam.

Race also has intentions of constructing a home on the property. This would provide a home designed around the family's particular needs as well as a rural setting safer for Adam's wandering tendency, and it would maintain the convenience of private and spacious land for horseback riding. Perhaps Race and her family will accomplish this goal; the Court has no opinion regarding what the Races can and cannot do with their assets, nor any position regarding the rationale, subjective reasonableness or plausibility of any particular course of action. The Court's sole task is to adjudicate the § 523(a)(8) legal question of whether excepting Race's student loans from discharge in bankruptcy will impose an undue hardship upon her or her dependents. The property is beyond the "baseline of reasonable but frugal

household expenditure." The totality in this case is flexibility. Race and her family may sell their homestead and build on the undeveloped property, or they may refinance the homestead, or sell it and move to a different home, or sell the undeveloped property. Race is not without options and the Court finds that the excepted student loans need not and surely will not prevent her from avoiding undue hardship for herself and her dependents.

### III. CONCLUSION

 "Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged." *Long*, 322 F.3d at 554–555. "[M]ere financial adversity without more will not do . . . the point is that Congress meant the extinguishment of student loans to be an available remedy to those severely disadvantaged economically as a result of unique factors which are so much a part of the debtor's life, present and in the foreseeable future, that the expectation of repayment is virtually non-existent unless by the effort the debtor strips himself of all that makes life worth living." *See Reynolds*, 2004 WL 63477, citing *In re Briscoe*, 16 Bankr. 128, 131 (Bankr.S.D.N.Y.1981), quoting from *In re Kohn*, 5 B.C.D. 419, 424 (Bankr. S.D.N.Y.1979).

Race's husband has steady and secure employment. Combined with sizeable annual tax refunds, they have enough to meet the basic needs of the family and possibly enough just from that income to make meaningful payments on the student loan debt. The Extended Repayment Plan is an affordable option. The student loan debt in sum is not so much as to be wholly or eternally insurmountable. Finally, Race has assets that could be sold or

reorganized. The homestead has a substantial amount of equity, and the undeveloped land represents a non-essential $300 per month obligation. The possibility of repayment of Race's student loans is not nonexistent, and excepting the debt from discharge will not strip Race or her family of all that makes life worth living.

In spite of the difficult and expensive challenges of raising five children of whom two are autistic, or perhaps out of that necessity, Race has managed to keep the family more than afloat. She is resourceful, makes plans with care and thoughtfulness following thorough research, and her decisions maximize utility, efficiency and quality. "Bankruptcy has always been a refuge from unwise decision making in financial matters, and from the financial results of unforeseen disaster in personal affairs." *See Reynolds*, 2004 WL 63477. Bankruptcy is not, however, a permissible way to maintain non-essential assets or any other type of disposable income or surplus at the expense of creditors. Race has neither suffered from unwise financial decision making nor from any other unforeseen disaster to the extent that excepting her student loans debt from discharge would constitute an undue hardship on her or her dependents. For these reasons, the complaint must fail.

### IV. DISPOSITION
IT IS HEREBY ORDERED:

1. The student loan debt owed by the plaintiff-debtor Carol Ann Race to the Texas Guaranteed Student Loan Corporation in the amount of $10,925.10, plus interest of fixed-rate 7.0% or $1.95 per day, since November 18, 2003, is not dischargeable pursuant to 11 U.S.C. 523(a)(8), and is excepted from the debtor's general discharge entered in bankruptcy case 02–60341; and

2. The student loan debt owed by the plaintiff-debtor Carol Ann Race to the Educational Credit Management Corporation in the amount of $22,983.37, plus interest of fixed-rate 7.0% or $3.03 per day, since November 18, 2003, is not dischargeable pursuant to 11 U.S.C. 523(a)(8), and is excepted from the debtor's general discharge entered in bankruptcy case 02–60341.

LET JUDGMENT BE ENTERED ACCORDINGLY.