**FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## FOR THE FIRST CIRCUIT

―――――――――――――――――――

## BAP NO. MS 18-016

―――――――――――――――――――

**Bankruptcy Case No. 14-30835-EDK**
**Adversary Proceeding No. 15-03001-EDK**

―――――――――――――――――――

**AUDREY EVE SCHATZ,**
**Debtor.**

―――――――――――――――――――

**AUDREY EVE SCHATZ,**
**Plaintiff-Appellant,**

**v.**

**ACCESS GROUP, INC., and**
**MASSACHUSETTS EDUCATIONAL FINANCING AUTHORITY,**
**Defendants-Appellees.**

―――――――――――――――――――

**Appeal from the United States Bankruptcy Court**
**for the District of Massachusetts**
**(Hon. Elizabeth D. Katz, U.S. Bankruptcy Judge)**

―――――――――――――――――――

**Before**
**Godoy, Lamoutte, and Finkle,**
**United States Bankruptcy Appellate Panel Judges.**

―――――――――――――――――――

**Francis C. Morrissey, Esq., on brief for Plaintiff-Appellant.**
**Martin A. Mooney, Esq., on brief for Defendant-Appellee, Access Group, Inc.**
**Melissa C. Donohoe, Esq., and Philip X. Murray, Esq., on brief for Defendant-Appellee,**
**Massachusetts Educational Financing Authority.**
**Mark Polebaum, Esq., and Michael Sugar, Esq., on brief of Amicus Curiae,**
**Commonwealth of Massachusetts.**

―――――――――――――――――――

**July 26, 2019**

―――――――――――――――――――

**Finkle, U.S. Bankruptcy Appellate Panel Judge.**

The debtor Audrey Eve Schatz (hereinafter "Schatz" or the "Debtor") appeals from the bankruptcy court's May 2, 2018 Memorandum of Decision and Judgment (collectively, the "Order") excepting her student loan obligations from discharge under § 523(a)(8).[1] The bankruptcy court determined that repayment of approximately $106,000.00 in student loans would not result in an undue hardship for Schatz, finding as a dispositive factor that the exempt equity in her home was sufficient to pay the loans in full. As discussed below, we **VACATE** the Order and **REMAND** to the bankruptcy court for further proceedings consistent with this opinion.

**RELEVANT PROCEEDINGS**

### I. Background

Schatz, a single mother now in her mid-60s, resides alone in the home she owns at 4 Pleasant Court, Great Barrington, Massachusetts (the "Property"). She purchased the Property in 1998 for $94,000.00. The parties stipulated that on April 1, 2014, Schatz recorded a declaration of exemption in the Property under the Massachusetts homestead exemption statute, Mass. Gen. Laws ch. 188, §§ 1, et seq. (the "Homestead Law").

Schatz has one child, who is a college student. Schatz earned an undergraduate degree in psychology from the University of Massachusetts in 1977, and received a law degree from Western New England College School of Law (now known as Western New England University School of Law) in 2009. She has been a licensed and practicing attorney in Massachusetts since 2010.

---

[1] Unless expressly stated otherwise, all references to "Code," "Bankruptcy Code," or to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq.

## II.     Bankruptcy Filing

Schatz filed a voluntary petition for chapter 7 relief, pro se, on August 29, 2014.   On

Schedule A-Real Property filed with her petition, she listed the value of the Property at

$165,000.00 and disclosed that it was subject to a mortgage lien in the approximate amount of

$59,000.00.   Other than the Property, Schatz's assets as reflected on her Schedule B-Personal

Property included a checking account with $2,000.00, a savings account with $8,710.00, and an

Individual Retirement Account with approximately $1,800.00.   By the time of trial in 2017, the

savings account balance was substantially reduced.   On her Amended Schedule C-Exemptions,

Schatz claimed a homestead exemption in the Property under Mass. Gen. Laws ch. 188, § 1 in

the amount of its listed value.   Schatz's Amended Schedule F-Creditors Holding Unsecured

Claims reflected that in addition to her student loan obligations,[2] she had two unsecured debts: a

credit card debt of $1,700.00 and a $23,000.00 obligation owed to her child's former school for

unpaid tuition.[3]   Schatz's schedules disclosed monthly income of $2,490.33 and monthly

expenditures of $2,911.17.   Schatz updated these schedules nearly three years later to reflect

monthly income of $1,483.02, and monthly expenses of $1,559.13, resulting in a $76.11 deficit

per month.

---

[2]   On Schedule F, Schatz listed the following student loan creditors: (1) "Access Group/ACS" for $17,262.14; (2) "Access Group/ACS" for $30,049.97; (3) "Access Group/ACS" for $18,276.86; (4) "Access Group/ACS" for $6,673.09; (5) "MEFA/ACS" for $22,607.91; and (6) the U.S. Department of Education for $104,337.19.

[3]   Although she noted on Schedule F that the school had obtained an attachment against the Property, the bankruptcy court docket in the main case shows that Schatz successfully avoided that lien.   See In re Colón Martinez, 472 B.R. 137, 139 n.4 (B.A.P. 1st Cir. 2012) (stating we may take judicial notice of the bankruptcy court's docket) (citation omitted).

**III.     The Complaint for Discharge of Student Loans**

Schatz received a chapter 7 discharge in December 2014.   The following month, she filed a two-count complaint against ACS Loan Servicing Group, Inc., Access Group, Inc., the U.S. Department of Education (the "DOE"), and Massachusetts Educational Financing Authority ("MEFA"), seeking a discharge of her student loans.   At the time of trial Schatz waived the second count of the complaint, which alleged that the loans did not fall under the definition of educational loans under section 221(d)(1) of the Internal Revenue Code.   Accordingly, the trial only involved the first count—the allegation that repayment of those loans would result in an "undue hardship" and render her "unable to maintain a minimal standard of living . . . and provide for her retirement."[4]   She further alleged that she suffered from several medical conditions, including lasting ill effects from a brain injury, chronic kidney disease, shingles, cellulitis, Hashimoto's disease, alopecia, psoriasis, and low blood pressure, all of which "interfere[d] with [her] ability to work."   In her complaint, Schatz also described an austere lifestyle, identifying aspects of her personal health and home maintenance she had deferred due to lack of funds, and stated that she relied, or had relied upon, "public assistance" in the form of fuel assistance, MassHealth (Massachusetts Medicaid), reduced school lunch, and reduced utilities.

In her prayer for relief, Schatz requested the entry of a judgment in her favor under § 523(a)(8), discharging the student loans in their entirety on the basis of "undue hardship."

---

[4]  Schatz subsequently filed a motion to amend the complaint to conform the caption to the cover sheet by adding MEFA as a defendant.   In addition, she sought to add allegations pertaining to two student loans owed to the DOE.   The bankruptcy court's docket reflects that the court permitted the amendments.

**IV.    Pretrial Stipulations**

The defendants, Access Group, Inc. ("Access Group") and MEFA, filed answers to the complaint, asserting affirmative defenses to Schatz's claims.   Shortly thereafter, Schatz obtained legal representation in the adversary proceeding and entered into stipulations with ACS Loan Servicing, Inc. ("ACS") and the DOE, agreeing to the voluntary dismissal of the complaint against those defendants.  The stipulation with the DOE provided that Schatz would enter into an income-based repayment plan for a period of five years, at the end of which her debt to the DOE would be deemed discharged.   The bankruptcy court approved the stipulations.

The parties identified the following questions of law for trial: (1) whether all or a portion of Schatz's student loan debt is dischargeable under § 523(a)(8); and (2) what is the proper legal standard for the bankruptcy court to apply in determining whether an undue hardship exists under § 523(a)(8).

**V.    The Trial**

The trial took place over the course of three days, in October and November 2017. Schatz was the only witness to testify.   By that time, she owed Access Group and MEFA approximately $82,000.00 and $28,000.00, respectively.   We summarize her testimony from the trial transcripts.

**A.    Schatz's Direct Examination**

From 1977 to 2006, Schatz was employed in a variety of jobs, none of which earned her more than $35,000.00 annually.   In 1993, she relocated from Florida to Great Barrington, Massachusetts.   Proceeds from the sale of her Florida home enabled her to purchase the Property in Great Barrington.   In 1999, Schatz adopted her child, who she raised single-handedly.   In an effort to increase her earnings Schatz decided to attend law school.   In 2005

5

she began law school at Western New England School of Law. At the time she entered law school, she suffered from several medical ailments, including Hashimoto's disease (a fatigue-inducing thyroid condition), and ongoing symptoms caused by an alleged brain injury she sustained in a car accident while in high school. This injury caused her to occasionally experience "brain fog," which necessitated law school test-taking accommodations. While in law school, she became ill with pneumonia and bronchitis and developed eczema and psoriasis. Nonetheless, she was able to complete her legal education without requiring any other accommodations.

Schatz financed nearly her entire law school education through student loans. She graduated in 2009, passed the state bar exam after three tries, and was admitted to the Massachusetts bar. Within the first year after law school, at the age of 56 or 57, Schatz submitted 75 job applications "in different fields." These applications yielded only a single interview, and no job offers. The following year she applied for 25 more jobs in the public and private sectors, with salaries ranging from $12.00 per hour to $90,000.00 per year. Her efforts included identifying job openings online, attending a Boston networking event, working with her law school's career office, and networking with people she knew in other states, all to no avail.

During the first two years following her law school graduation she made ends meet by performing housecleaning services, painting, and gardening. She also served as the director for an organization she founded while in law school—the Berkshire Center for Justice ("Berkshire Center")—which offered free legal clinics and reduced fee services for low income clients. Additionally, she provided pro bono legal services and reduced fee services to clients of the Berkshire Center.

About three years after her law school graduation Schatz realized she "wasn't going to get a job." She discontinued her job search and focused on establishing a private practice. Her few paying clients include friends who need assistance with will preparation or real estate closings. She continues to work for the Berkshire Center as its executive director, but only receives a salary of $50.00 per hour when its budget permits. She is also paid at the hourly rate of $100.00 for her legal services to paying clients of the Berkshire Center. Schatz testified that she is unable to work more hours to increase her income because of her "medical issues."

For the years 2011 through 2014, Schatz's tax returns list the following approximate annual income: $10,800.00 in net business income in 2011; $14,500.00 from self-employment in 2012; $61.00 in net rental income and $10,200.00 in net business income for 2013; and $14,800.00 from self-employment in 2014.

From 2012 to 2013, she continued to experience a number of medical issues which contributed to the reduction in her income during that period, although she stated she had limited recall of those years because of her health conditions. She stressed that in July 2013, she fell down the stairs in her home and the injuries she sustained causes her to have ongoing memory issues, cognitive difficulties, fatigue, a torn rotator cuff, ocular migraines, tinnitus, reading difficulties, and weakness. For these symptoms she received care from her primary care physician and a physical therapist although she has not fully recovered. As proof of her physical impediments, Schatz introduced into evidence a letter from nurse practitioner Kathy Korte ("Nurse Korte"), dated January 19, 2015, which referenced her several "medical issues causing an inability for her to work under pressured circumstances or full-time," and "limit[ing] her current and future inability to work." The letter also noted that Schatz "has other medical conditions that while they may not directly affect her ability to work, doctor appointments,

7

diagnostic testing, treatment and recovery are time-consuming and take away from the time she is available for work."

To supplement her income, in 2013 or 2014, Schatz began renting a room in her house through Airbnb (a short-term rental website) which produced annual income of approximately $1,000.00. Beginning in 2014, Schatz received referrals for performing real estate refinance closings from a Boston law firm which pays her $75.00 to $100.00 per closing. At the time of trial in October 2017, Schatz had performed only one closing for that year. In summary, Schatz testified that she has four sources of income: the Berkshire Center; her private practice; room rentals; and referral fees from real estate closings.

Turning to her student loans, Schatz maintained that she made payments on these loans using savings from the sale proceeds of her Florida home. By living frugally she was able to save some money, remain current on her financial obligations, and contribute $4,000.00 toward her child's college housing expense. As evidence of her austere lifestyle and sacrifices she endures, she has foregone some medical and dental procedures and needed repairs to her house, household appliances, and her late-model, high-mileage vehicle, and maintains her home heat at fifty degrees. She had unsuccessfully sought financing for the home repairs. Additionally, she had applied for loans to assist with her child's tuition, but her loan applications were denied.

### B.      Schatz's Cross-Examination

Upon cross-examination by Access Group, Schatz testified that when she embarked upon her law school education, she did not apprehend the risk that she might not find a high-paying job. She further testified that despite financial challenges resulting in limited payment to her, the Berkshire Center was current on its rent payments and other bills, and she was current on her mortgage payments, real estate taxes, and homeowner's insurance.

During cross-examination by MEFA, Schatz testified that the assessed value of the Property in 2015 was $204,000.00 and that Zillow.com reflected a market value of $228,000.00. However, on the Free Application for Federal Aid form submitted in 2016 for her child's student loan applications, Schatz listed the Property's value at $125,000.00. She explained that this figure actually may have been her estimate of the equity in the Property.

Turning to her testimony about her asserted medical conditions and their alleged impact on her earning capacity, Schatz revealed in her cross-examination that she had edited the letter from Nurse Korte before it was signed. Schatz submitted her edited version of the letter to Nurse Korte stating that "[t]he Court requires more of a report than a letter. I expanded your letter to give more details. Feel free to sign this letter or call me to discuss it."

In response to additional questioning by MEFA's attorney, Schatz testified further regarding her various health conditions and certain medical reports which indicated few, if any, abnormal findings. MEFA also questioned Schatz about a diagnostic MRI report of her brain that found her brain stem and cerebellum were normal and there was no evidence of "intracranial hemorrhage." Schatz challenged these findings, asserting: "[J]ust because this [MRI] came back normal doesn't mean there was no brain injury." As for some of the afflictions Schatz alleged she suffered from, there were no medical reports from her doctors substantiating her testimony and, aside from Nurse Korte's general letter edited by Schatz, the record discloses no medical reports from her physicians corroborating her claim that her various medical conditions significantly impaired her ability to increase her income.

## C.    The Court's Ruling

After taking the matter under advisement, the bankruptcy court issued its ruling denying Schatz's request to discharge her student loans. Schatz v. U.S. Dep't of Educ. (In re Schatz),

584 B.R. 1 (Bankr. D. Mass. 2018). The bankruptcy court acknowledged that there is a division among courts on the applicable test to determine whether a debtor has established the requisite hardship for excepting student loan debt from discharge under § 523(a)(8), and the U.S. Court of Appeals for the First Circuit ("First Circuit") has not yet adopted a specific test.[5] Here the bankruptcy court employed the "totality of the circumstances" test for its analysis. This test, the bankruptcy court noted, has been applied by most "former and currently-sitting bankruptcy judges in Massachusetts, as well as the U.S. Bankruptcy Appellate Panel for the First Circuit (the 'BAP') . . . ." Id. at 6. As with other courts that have adopted this test, the bankruptcy court rejected the Brunner test, concluding that it "imposes requirements of proof that are not supported by the statutory text . . . ." Id.

The bankruptcy court, applying the totality of the circumstances test, found that the Debtor "is an intelligent, well-educated woman who, regardless of whether she is able to substantially increase her income, has reached a level of consistency in her current employment endeavors." Id. at 7. The court further found that Schatz "suffers from several medical conditions" but that she is "receiving care to successfully alleviate, improve, or regulate those conditions." Id. Additionally, based on Schatz's testimony and the expenses listed on her amended Schedule J, the court found that Schatz "lives a rather spartan lifestyle not susceptible to further reduction of necessary expenses." Id. at 5. The court did not assess Schatz's

---

[5] A majority of courts outside of the First Circuit follow the test enunciated by the Second Circuit in Brunner v. New York State Higher Education Services Corp. (In re Brunner), 831 F.2d 395 (2d Cir. 1987). This is a three-part test which requires a debtor to prove that: (1) based on current income and expenses, if required to repay student loans, the debtor will be unable to maintain a "minimal" standard of living for the debtor or the debtor's dependents; (2) there are additional circumstances demonstrating that this state of affairs is likely to persist for a significant portion of the loans' repayment periods; and (3) the debtor has made good faith efforts to repay the loans. Id. at 396; see also Ablavsky v. U.S. Dep't of Educ. (In re Ablavsky), 504 B.R. 709, 719 (Bankr. D. Mass. 2014) (collecting circuit level cases applying the Brunner test).

10

capacity to increase her income in the foreseeable future to enable her to pay her student loans, concluding, instead, that "the outcome in this case turns on a separate, and dispositive, issue: the existence of substantial equity in the Debtor's Property that can be used to pay these student loans in full." Id. at 7. The court reasoned:

> [O]n the Petition Date, when the mortgage balance was approximately $59,000 (and excluding the judicial lien that was later avoided) the Debtor estimated there to be $106,000 of equity in the Property.
>
> Approximately 2 years later, after deducting her estimate of home repair costs from $228,000, the Debtor believed that the equity had appreciated to $125,000. The Debtor did not indicate through testimony or documentary evidence that that amount had decreased a year later, at the time of trial. Accordingly, based on the Debtor's own evidence and testimony, given that the student loans at issue here total approximately $110,000, the Court finds that the Debtor has equity in the Property more than sufficient to pay the total of the Defendant's loans in full.
>
> The mere existence of *some* equity in an asset does not always result in the denial of a debtor's request that a student loan be discharged for undue hardship under § 523(a)(8). For instance, if a debtor has no excess income above that required to maintain a minimal standard of living, requiring a debtor to refinance or sell an asset that will not generate sufficient funds to pay off the debt in full may result in the debtor exchanging a student loan debt they cannot afford for an increased mortgage debt they cannot afford. Or it may leave the debtor with reduced student loans that they still cannot afford. See, e.g., Greenwood v. Educ. Credit Mgmt. Corp. (In re Greenwood), 349 B.R. 795, 802 (Bankr. D. A[ri]z. 2006) (student loans discharged despite equity in home where amount of equity that could be refinanced would be insufficient to pay student loan off in full and debtors had no excess income with which to make an increased mortgage payment); Lieberman v. Educ. Credit Mgmt. Corp. (In re Lieberman), 2004 WL 555245, *5 (Bankr. D. Minn. 2004) (where proceeds from refinancing of home loan could not pay off student loan in full, student loans were discharged as the debtors had no surplus income with which to pay even a reduced balance).
>
> However, in cases where a debtor has access to equity in an asset that could satisfy the student loan in full, courts have held that payment of the student loan does not present an undue hardship. See, e.g., Race v. Educ. Credit Mgmt. Corp. (In re Race), 303 B.R. 616, 625 (Bankr. D. Minn. 2004) (court considered existence of home equity that could satisfy student loans in full if property was sold in ruling that the loans would not be discharged); Ammirati v. Nellie Mae, Inc. (In re Ammirati), 187 B.R. 902 (D.S.C. 1995), aff'd[,] 85 F.3d 615 (4th Cir. 1996) (upholding Bankruptcy court's partial discharge of student loan and noting

11

with approval that the remaining Balance was expected to be paid in full from equity realized in sale of debtor's home).

> Given the large amount of equity in the Debtor's Property, the burden was on the Debtor to present some evidence that (1) this particular home is necessary for the Debtor to maintain a minimal standard of living and (2) no alternative housing is available for a monthly rental payment commensurate with her current mortgage payment. See Miller v. Sallie Mae, Inc. (In re Miller), 409 B.R. 299, 321 (Bankr. E.D. Pa. 2009). With regard to the income the Debtor receives from Airbnb rentals, an analysis of the Debtor's own evidence indicates that relocation to an affordable rental unit and the resultant alleviation of the real estate tax obligation will more than offset the loss of rental income.

> . . . Here, because the Court finds that the equity in the Property is sufficient to pay the student loans owed to the Defendants in full, and because the Court finds that the liquidation of that equity will not result in the Debtor being unable to maintain a minimal standard of living through the foreseeable future, the Court does not find that excepting the loans from discharge will result in an undue hardship for the Debtor or the Debtor's dependents within the meaning of § 523(a)(8).

Id. at 8-9. In a footnote, the court briefly noted the effect of Schatz's homestead exemption on the undue hardship determination, stating:

> This Court agrees with others that have concluded that, in the context of § 523(a)(8), "[t]he exempt character of an asset does not necessarily preempt its relevance to a hardship evaluation." Armesto v. New York State Higher Educ. Servs. Corp. (In re Armesto), 298 B.R. 45, 48 (Bankr. W.D.N.Y. 2003). While the equity in the Debtor's Property is protected from attachment by creditors to satisfy their debts by virtue of the Debtor's homestead exemption, "the debtor's access to that exempt asset may nonetheless allow payment without any undue hardship to the debtor." Id.

Id. at 8 n.6.

The court expressly declined to announce a *per se* rule on the consideration of exempt assets in the context of the undue hardship analysis, cautioning that "each case must be analyzed on its own unique set of facts." Id. at 9 (citing In re Armesto, 298 B.R. at 48). It concluded that "the outcome in this case turns on a separate, and dispositive, issue: the existence of

12

substantial equity in the debtor's Property that can be used to pay these student loans in full." Id. at 7. The court added that the decision does not require the Debtor to sell the Property to pay the student loans, but the existence of equity "negates any claim that payment of the loan imposes an undue hardship." Id. at 9.

Judgment was entered in favor of Access Group and MEFA, and the Debtor appealed.

## POSITIONS OF THE PARTIES

### I. Schatz

On appeal, Schatz argues that the bankruptcy court ignored § 522, which provides that exempt property "is not liable during or after the case for any debt of the debtor that arose . . . before commencement of the case." The plain language of § 522, Schatz maintains, protects the equity in her residence, a conclusion, she argues, is buttressed by Law v. Siegel, 571 U.S. 415, 423 (2014), wherein the Supreme Court ruled that "§ 522 does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate." She contends that requiring her to "use the exempt equity in her home to discharge her student loan debt is tantamount to a surcharge on that exempt property—a surcharge which, according to Law, is prohibited by § 522(c)." Further, she maintains that her home equity, the amount of which is well below the aggregate amount allowed under the Massachusetts homestead exemption, is "forever immunized" and is "the asset upon which she [will rely] when she is unable to work whether due to health or age." Finally, Schatz posits that because her student loans were not obtained through fraud, her exempted home equity "does not fall within the ambit of § 522(c)(4)" (which leaves exempted property liable for "a debt in connection with fraud in obtaining . . . any . . . loan . . . for purposes of financing an education at an institution of higher education"). See 11 U.S.C. § 522(c)(4).

13

In short, she contends that she has met her burden of demonstrating undue hardship under a proper application of the totality of the circumstance test by establishing that her living standard "barely reaches a subsistence level," despite her austere lifestyle; and her "age, health and prior working history all confirm that her dire financial circumstances will persist," and are subject to "substantial future diminution."

## II.     Access Group, Inc.

Access Group maintains that Schatz has failed to satisfy her burden of showing exceptional circumstances—such as illness or the existence of an unusually large number of debts—which would justify discharge of her student loans.   Garden-variety hardship does not satisfy the undue hardship test, it emphasizes.   Underemployment or unemployment, according to Access Group, is also insufficient to establish undue hardship.   It challenges Schatz's reliance on Law v. Siegel, supra, distinguishing it from the circumstances here because Schatz was not *required* to sell the Property.   Access Group also draws support for its position from the fact that just as the income of a non-debtor spouse must be factored into an undue hardship analysis, so too, it asserts, must the amount of Schatz's exempt home equity.

## III.  MEFA

MEFA also argues that Schatz failed to meet her burden because the record lacks documentary evidence of her job search efforts as well as medical evidence that any of her health conditions materially impair her ability to work.   According to MEFA, Schatz's "age, by itself, should not constitute an additional circumstance or otherwise serve as a basis for the finding of the existence of an undue hardship."   Citing In re Armesto, supra, and Education Credit Management Corp. v. Nys, 446 F.3d 938, 947 (9th Cir. 2006), MEFA similarly contends that the

14

bankruptcy court properly considered Schatz's equity in the Property in denying an undue hardship exception.

## IV.    Amicus Curiae, Office of the Attorney General

The Massachusetts Office of the Attorney General, on behalf of the Commonwealth of Massachusetts (the "Commonwealth"), filed a brief in support of Schatz's student loan discharge quest.[6]  The Commonwealth states that it "has a longstanding statutory policy, first enacted in 1851, to protect its residents' homes from the claims of creditors."  It explains that the Homestead Law protects up to $125,000 of equity without requiring any filing with the registry of deeds and up to $500,000 of equity for residents who have recorded a declaration of homestead.  It argues that by protecting families, the Homestead Law conserves public resources, making it less likely that residents will become homeless or otherwise require state housing assistance.  The Commonwealth maintains that the decision of the bankruptcy court materially undermines the Homestead Law and directly conflicts with Bankruptcy Code §§ 522(b)(3)(A) and 522(c), and challenges the bankruptcy court's conclusion that "[n]othing in [its] opinion requires the Debtor to sell the Property . . . ."  It observes that there is no other way for the Debtor to tap her home equity to pay off her student loans other than to sell or refinance her home despite being protected by the homestead exemption.  Accordingly, it contends that the bankruptcy court erred as a matter of law by basing its decision "solely on the court's conclusion that the Debtor's exempt homestead is available to pay her student loans."  It also points out that the cases the bankruptcy court relied upon did not even consider the express statutory language of § 522(c) protecting exempt property from liability for pre-petition debt.

---

[6]  Pursuant to Fed. R. Bankr. P. 8017, "an agency of a state may file an amicus-curiae brief without the consent of the parties or leave of the court."  See Fed. R. Bankr. P. 8017(a).

15

Finally, the Commonwealth draws upon the "somewhat analogous" determination concerning "disposable income" in chapter 13 cases, citing several cases in which courts have concluded that exempt property may *not* be considered in that calculation.

## JURISDICTION

We may hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees. See 28 U.S.C. §§ 158(a), (b), and (c); see also Bullard v. Blue Hills Bank, 135 S. Ct. 1686, 1695 (2015). "A decision is final if it ends the li[ti]gation on the merits and leaves nothing for the court to do but execute the judgment." Fleet Data Processing Corp. v. Branch (In re Bank of New Eng. Corp.), 218 B.R. 643, 646 (B.A.P. 1st Cir. 1998) (citations omitted) (internal quotation marks omitted). "Generally, a bankruptcy court's order regarding the dischargeability of a debtor's student loans is a final order." Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010) (citing Educ. Credit Mgmt. Corp. v. Kelly (In re Kelly), 312 B.R. 200, 204 (B.A.P. 1st Cir. 2004)).

## STANDARD OF REVIEW

We review a bankruptcy court's findings of fact under the "clearly erroneous" standard of review and its conclusions of law de novo. In re Kelly, 312 B.R. at 204. An "undue hardship" determination is a question of law to which the de novo standard of review applies, but the factual findings underlying that determination are reviewed under the clearly erroneous standard. Id. (citations omitted); see also In re Bronsdon, 435 B.R. at 796 (stating "a bankruptcy court's undue hardship determination . . . poses a mixed question of law and fact"). "De novo review means that the appellate court is not bound by the bankruptcy court's view of the law." Banco Cooperativo de P.R. v. Ramos Herrera (In re Ramos Herrera), 589 B.R. 444, 451 (B.A.P. 1st Cir.

16

2018) (citation omitted).   "A finding is clearly erroneous when, although there is evidence to support it, the Panel is left with the definite impression that a mistake has been made." Whitcomb v. Smith (In re Smith), 572 B.R. 1, 15 (B.A.P. 1st Cir. 2017) (citation omitted).

## DISCUSSION

**I.      The Standard Governing Dischargeability of Student Loans: § 523(a)(8)**

"Student loans are presumptively non-dischargeable."   Ayele v. Educ. Credit Mgmt. Corp. (In re Ayele), 490 B.R. 460, 462 (D. Mass. 2013).   Section 523(a)(8) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> . . . .
>
> > (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
> >
> > > (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
> > >
> > > > (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
> > >
> > > (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8).

"The Bankruptcy Code does not define 'undue hardship,' and the statute does not provide guidance."   In re Ablavsky, 504 B.R. at 718.   The First Circuit has observed that debtors have a "formidable task" in establishing undue hardship because "Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start does not automatically apply to student loan debtors."   Nash v. Conn. Student Loan Found. (In re Nash), 446 F.3d 188, 191 (1st Cir. 2006).

17

## II.     Assessing Undue Hardship under § 523(a)(8)

Under § 523(a)(8), the creditor has the initial burden of establishing that the debt qualifies as the type excepted from discharge, and the debtor has the burden of establishing that excepting the debt from discharge will cause an undue hardship on the debtor or his dependents. In re Bronsdon, 435 B.R. at 796.   As we noted, the bankruptcy court adopted the "totality of circumstances" test to analyze Schatz's undue hardship claim.   We have previously held that "in the absence of controlling authority in this Circuit, the Bankruptcy Court was free [to] choose its own approach to evaluate undue hardship."   In re Kelly, 312 B.R. at 206.   The parties raise no challenge to the test employed by the bankruptcy court, and in fact, Schatz supports its use in this case.[6]   Rather, the crux of Schatz's argument in this appeal is that the court misapplied the test in basing its determination on the exempt equity in her home.

Under the totality of the circumstances test, the court must consider "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable, necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case."   In re Ablavsky, 504 B.R. at 719

---

[6]   Decisions issued by bankruptcy courts in our circuit support this choice.   In a recent line of cases, bankruptcy courts within this circuit similarly employed the totality of circumstances test.   See, e.g., Morris v. Mass. Educ. Fin. Auth. (In re Morris), Adv. Pro. No. 18-1035-BAH, 2019 WL 1418699, at *4 (Bankr. D.N.H. Mar. 27, 2019) (applying the totality of the circumstances test); Erkson v. U.S. Dep't of Educ. (In re Erkson), 582 B.R. 542, 550 (Bankr. D. Me. 2018) (same); Smith v. U.S. Dep't of Educ. (In re Smith), 582 B.R. 556, 565 (Bankr. D. Mass. 2018) (applying totality of circumstances test, notwithstanding its observation that "both tests for 'undue hardship' are flawed"); Brown v. Northstar Educ. Fin., Inc. (In re Brown), Adv. Pro. No. 15-0203, 2017 WL 745590, at *4 (Bankr. D. Me. Feb. 24, 2017) (applying totality of circumstances test), aff'd, 581 B.R. 695 (D. Me. 2017), aff'd, No. 1012 (1st Cir. Mar. 13, 2019).   This is also consistent with earlier case law in the circuit.   See, e.g., In re Bronsdon, 435 B.R. at 798; Kopf v. U.S. Dep't of Educ. (In re Kopf), 245 B.R. 731, 739-40 & 734 n.16 (Bankr. D. Me. 2000).

(quoting Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554 (8th Cir. 2003)).

One Massachusetts bankruptcy court described this inquiry as:

> **Can the debtor now, and in the foreseeable future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?** In answering this question, the Court should consider all relevant evidence—the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job[,] move or cut living expenses. In addition, other factors not listed here may impact a particular debtor's case.
>
> This "laundry list" of considerations does not suggest that focusing on the totality of the circumstances is purely an ad hoc, willy-nilly approach to undue hardship under § 523(a)(8). It does reflect the fact that the lives of all debtors are complex and each individual case is entitled to be evaluated in its context. Nor does such an approach present extraordinary difficulties. Rather, by focusing on the central question, as stated above, the relevance of any particular factor should be clear; if a particular factor helps answer that question, it should be given appropriate weight and . . . "if a factor cannot be taken account of in a principled undue hardship assessment, it should not be considered a material factor at all." Kopf, 245 B.R. at 741.

Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks), 331 B.R. 18, 31 (Bankr. D. Mass. 2005) (citations omitted).

## III. The Homestead Exemption

"The filing of a bankruptcy petition under Chapter 7 creates a bankruptcy 'estate' generally comprising all of the debtor's property." Law, 571 U.S. at 417 (citing 11 U.S.C. § 541(a)(1)). "The Code authorizes the debtor to 'exempt,' however, certain kinds of property from the estate, enabling him to retain those assets post-bankruptcy." Id. (citing 11 U.S.C. § 522(b)(1)). Section § 522(c) explicitly provides: "[P]roperty exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined

19

under section 502 of this title as if such debt had arisen, before the commencement of the case . . . ."  11 U.S.C. § 522(c).  "Except in particular situations specified in the Code, exempt property 'is not liable' for the payment of 'any [pre-petition] debt' or 'any administrative expense.'"  Law, 571 U.S. at 417-18 (citing 11 U.S.C. § 522(c)).

"Section 522(d) of the Code provides a number of exemptions unless they are specifically prohibited by state law."  Id. at 418 (citing 11 U.S.C. § 522(b)(2), (d)).  "One, commonly known as the 'homestead exemption,' protects up to $[23,675.00] in equity in the debtor's residence."  Id. (citing 11 U.S.C. § 522(d)(1) and Owen v. Owen, 500 U.S. 305, 310 (1991)).  Alternatively, as Schatz did in her case, a debtor may elect available exemptions under applicable state law.  See 11 U.S.C. § 522(b)(3)(A)).  "Some [s]tates, [such as Massachusetts], provide homestead exemptions that are more generous than the federal exemption[.]"  Law, 571 U.S. at 418 (citation omitted).

The Supreme Court recognized in Law v. Siegel that "§ 522 sets forth a number of carefully calibrated exceptions and limitations, some of which relate to the debtor's misconduct."  571 U.S. at 424.  But, the Supreme Court made it clear that "courts are not authorized to create additional exceptions."  Id. (citations omitted).  For student loans, § 522(c)(4) expressly provides that exempt property is liable for pre-petition debts that arise from *fraud* in connection with such loans.  See 11 U.S.C. § 522(c)(4).

The First Circuit succinctly explained the policy underpinnings of exemptions:

The Supreme Court has stated that "a central purpose of the Bankruptcy Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"  Grogan v. Garner, 498 U.S. 279, 286, 11 S. Ct. 654, 112 L. Ed. 2d 755 (1991) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S. Ct. 695, 78 L. Ed. 1230 (1934)).  The Bankruptcy Code facilitates a fresh start,

in part, by allowing property properly exempted under § 522 to be immunized against liability for pre-petition debt.   See Owen, 500 U.S. at 309[.]

Pasquina v. Cunningham (In re Cunningham), 513 F.3d 318, 324 (1st Cir. 2008) (footnote omitted).

The Homestead Law under which Schatz claimed her exemption "permits an individual who owns and occupies real property as her residence to place her equity in the residence, generally up to a maximum of $500,000, beyond the reach of creditors."   In re Welch, 486 B.R. 1, 3 (Bankr. D. Mass. 2013) (citing Mass. Gen. Laws ch. 188, §§ 1, et seq. (2010)).[7]   Like its federal law counterpart, the Massachusetts exemption statute was "designed to benefit the homestead declarant . . . by protecting the family residence from the claims of creditors." Shamban v. Masidlover, 705 N.E.2d 1136, 1138 (Mass. 1999) (citing Dwyer v. Cempellin, 673 N.E.2d 863, 866 (Mass. 1996)); Khan v. Bankowski (In re Khan), 375 B.R. 5, 12 (B.A.P. 1st Cir. 2007); see also Mass. Gen. Laws ch. 188, § 3.

The Massachusetts Supreme Judicial Court explained that as a matter of public policy the exemption is to be liberally construed for the benefit of debtors:

> Homestead laws are based on a public policy which recognizes the value of securing to householders a home for the family regardless of the householder's financial condition.   "The preservation of the home is of paramount importance because there the family may be sheltered and preserved."   Public policy dictates that exemption laws, such as homestead provisions, should be liberally construed to comport with their beneficent spirit of protecting the family home.

---

[7]   Mass. Gen. Laws ch. 188, § 3 provides, in pertinent part:

> (a) An estate of homestead to the extent of the declared homestead exemption in a home may be acquired by 1 or more owners who occupy or intend to occupy the home as a principal residence. The estate of homestead shall be created by a written declaration executed and recorded in accordance with section 5.

Mass. Gen. Laws ch. 188, § 3.

21

> The obvious legislative purpose of [Mass. Gen. Laws ch.] 188, § 1, is to protect the home from the claims of creditors for the benefit of the homestead declarant and his or her family. We conclude that, in light of the public policy and the purpose of the statute, the State homestead exemption should be construed liberally in favor of the debtors.

Dwyer v. Cempellin, 673 N.E.2d at 866 (citations omitted).

## IV.  The Standards Applied

This appeal involves the interplay between the statutory provisions underlying the homestead exemption and the dischargeability of student loan debt. The parties do not challenge the totality of the circumstances test employed by the bankruptcy court and we discern no error in the bankruptcy court's choice. The overarching question is whether in giving dispositive weight to a single factor—the existence of exempt equity in Schatz's home—the bankruptcy court properly applied the totality of the circumstances test in this case? See In re Race, 303 B.R. at 624 (stating "the choice and weighting" of factors in applying totality of the circumstances test "are ultimately subject to de novo review by an appellate forum") (citing In re Long, 322 F.3d at 553). We conclude it did not.

### A.  Protection of Exempt Property Under § 522(c)

Our analysis starts with the text of § 522(c): "property exempted . . . is not liable during or after the case for any debt of the debtor that arose . . . before the commencement of the case[.]" 11 U.S.C. § 522(c). Both the Supreme Court and the First Circuit have explicitly stated that subject to limited exceptions relating to a debtor's misconduct, this provision protects property a debtor has claimed exempt under § 522(c) from liability for any pre-petition debt. See Law, 571 U.S. at 424 (citation omitted); In re Cunningham, 513 F.3d at 323 ("Property that is properly exempted under § 522 is immunized against liability for prebankruptcy debts, subject only to a few exceptions . . . .").

22

Here, neither MEFA nor Access Group suggests that Schatz did not properly exempt the Property or that one of the § 522(c) exceptions (relating to debtor misconduct) applies. Thus, it follows from both Law v. Siegel and In re Cunningham that the Property—having been properly exempted—falls within the scope of § 522(c)'s protection. See In re Cunningham, 513 F.3d at 324 ("By the plain language of the statute, exemptions under § 522(c) . . . mak[e] the property subject to an exemption unavailable for the satisfaction of pre-petition debt . . . .").

Even were we to conclude that the language of § 522(c) is somehow ambiguous (and we do not), canons of statutory construction and the fraud exception articulated in § 522(c)(4) would similarly compel a conclusion that Schatz's home equity is protected from liability for her student loans.[8] When construing statutes, there is a presumption that "Congress acts intentionally and purposely in the disparate inclusion or exclusion" of particular words or phrases. United States v. Councilman, 418 F.3d 67, 73 (1st Cir. 2005) (citations omitted). "The maxim '*expressio unius est exclusio alterius'*—which translates roughly as 'the expression of one thing is the exclusion of other things'—is a venerable canon of statutory construction[.]" United States v. Hernández-Ferrer, 599 F.3d 63, 67 (1st Cir. 2010) (citation omitted). The canon applies "in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 81 (2002). Stated another way: "[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent." Hillman v. Maretta, 569 U.S. 483, 496 (2013) (citation omitted) (internal quotation marks omitted).

---

[8] Section 522(c)(4) provides that exempted property "shall be liable for a debt in connection with fraud in the obtaining or providing of any scholarship, grant, loan, tuition, discount, award, or other financial assistance for purposes of financing an education at an institution of higher education . . . ." 11 U.S.C. § 522(c)(4).

23

Applying these principles of statutory construction to the issue before us supports the positions advocated by Schatz, namely, that by explicitly permitting exempt assets to be liable for pre-petition student loan debt incurred through fraud under § 522(c)(4), Congress did not intend to allow creditors to access exempt assets for payment of pre-petition student loan debt in the absence of such debtor fraud. The student loan creditors have not presented any facts or circumstances that would overcome this statutory rule of construction to render Schatz's exempt home vulnerable to satisfy her pre-petition student loan obligations. See Councilman, 418 F.3d at 74-75 (stating that the presumption of application of this statutory rule of construction is rebuttable).

**B.      Appropriate Considerations to Assess Undue Hardship**

The totality of the circumstances test is fact-intensive, requiring bankruptcy courts to examine the unique facts and circumstances of each case. Craig v. Educ. Credit Mgmt. Corp. (In re Craig), 579 F.3d 1040, 1046 (9th Cir. 2009); Cumberworth v. U.S. Dep't of Educ. (In re Cumberworth), 347 B.R. 652, 658 (B.A.P. 8th Cir. 2006). While this test contemplates consideration of a wide range of factors, see In re Hicks, 331 B.R. at 31 (discussing "laundry list" of considerations), a direct reference to exempt assets does not appear among the enumeration of factors considered by courts within this circuit. See, e.g., In re Bronsdon, 435 B.R. at 798; Lorenz v. Am. Educ. Servs. (In re Lorenz), 337 B.R. 423, 430-31 (B.A.P. 1st Cir. 2006); Morris v. Mass. Educ. Fin. Auth. (In re Morris), Adv. Pro. No. 18-1035-BAH, 2019 WL 1418699, at *4 (Bankr. D.N.H. Mar. 27, 2019); In re Kopf, 245 B.R. at 745 (all omitting the presence of exempt assets from the list of factors to be considered.). Further, from our review of case law within this circuit, we can find no prior case in which a court considered the existence or amount of exempt home equity as a prime factor in assessing the discharge of

24

student loans due to undue hardship.   The Hicks court does, however, cite as one of the several factors "the debtor's ability to . . . move or cut living expenses."   In re Hicks, 331 B.R. at 31. We note that the omission of exempt assets from the list of considerations or factors is consistent with the policy of "facilit[ating] a debtor's] fresh start . . . by allowing" certain property "to be immunized against liability for pre-petition debts."   In re Cunningham, 513 F.3d at 324 (citation omitted).

We also recognize that several courts in other circuits list "a lack of assets, exempt or otherwise," among the non-exhaustive factors a court may consider when assessing undue hardship.   See, e.g., In re Nys, 446 F.3d at 947; Lilly v. Ill. Student Assistance Comm'n (In re Lilly), 538 B.R. 45, 50 (Bankr. S.D. Cal. 2013); Daniels v. Bank One (In re Daniels), Adv. Pro. No. 10-00044, 2010 WL 3733889, at *4 (Bankr. D. Mont. Sept. 15, 2010); In re Hamilton, No. 07-68258-MHM, 2009 WL 6499258, at *2 (Bankr. N.D. Ga. Mar. 23, 2009); In re Greenwood, 349 B.R. at 803 n.7.   In these cases, however, the courts did not examine the relationship between § 522(c) and § 523(a)(8) in the context of the undue hardship determination beyond merely listing the "lack of assets, exempt or otherwise" among the relevant considerations and offer no analysis of the critical issue before us.   Consequently, we conclude that the same provide minimal persuasive value.

The same is true of the cases particularly relied upon by the bankruptcy court in concluding that Schatz's home equity was the dispositive factor preventing the discharge of her student loans.   See, e.g., In re Greenwood, 349 B.R. at 803 (concluding, after applying Brunner test, the equity in the debtor's home "is not currently accessible and is insufficient to pay off" the student loan); In re Race, 303 B.R. at 625 (considering the "substantial amount of equity" in the debtor's home and concluding that the "possibility of repayment of [debtor's] student loans is not

25

nonexistent" without discussion of § 522(c) or whether the debtor had invoked a homestead exemption); In re Ammirati, 187 B.R. at 907 (applying Brunner and affirming bankruptcy court's refusal to discharge a portion of student loan debt, "anticipat[ing] Debtor's ability to make some payments on his student loan once his home was sold"). While these decisions signify that the consideration of home equity may be proper under certain circumstances, they do not state that the availability of exempt equity in a home is a determinative factor. Thus, the bankruptcy court's reliance on these cases is misplaced.

A debtor's choice of home and the expenditures a debtor incurs in connection with that home may be relevant to the "undue hardship" determination depending on a debtor's particular circumstances. For example, in In re Miller, 409 B.R. at 320-21, upon which the bankruptcy court relied, the court considered the "unnecessarily large size of the [debtor's] [h]ome" for their family size, the "unusually high and burdensome percentage of their income [spent] on their home," resulting in their post-petition default under the mortgage, and the debtor's failure to produce "evidence regarding housing alternatives." The Miller court also factored into its assessment the likelihood that the debtors were going to lose their home to foreclosure because of their inability to afford the home. See id. at 321. Such issues reflect upon a debtor's lifestyle and choice of living expenses and whether the debtor is able to "maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents," which are appropriate considerations. In re Hicks, 331 B.R. at 31; see also Educ. Credit Mgmt. Corp. v. Savage (In re Savage), 311 B.R. 835, 840-41 (B.A.P. 1st Cir. 2004) (considering debtor's lifestyle in determining undue hardship); Cheney v. Educ. Credit Mgmt. Corp. (In re Cheney), 280 B.R. 648, 663 (N.D. Iowa 2002) (discussing debtor's lifestyle choices in context of undue hardship assessment); Lewis v. Ill. Student Assistance Comm'n (In re Lewis), 276 B.R. 912, 916 (Bankr.

26

C.D. Ill. 2002) (considering "lifestyle attributes" in undue hardship assessment); Naranjo v. Educ. Credit Mgmt. Corp. (In re Naranjo), 261 B.R. 248, 255 (Bankr. E.D. Cal. 2001) (same); In re Ammirati, 187 B.R. at 907 (considering whether debtor's failure to sell highly leveraged house indicated he had not minimized his expenses). But lifestyle choices should not be conflated with the consideration of the mere existence of home equity that is exempt and immunized from liability for pre-petition debt.

Here, although the bankruptcy court found that Schatz "lives a rather spartan lifestyle not susceptible to further reduction of necessary expenses," 584 B.R. at 5, it nonetheless ruled:

> Given the large amount of equity in the Debtor's Property, the burden was on the Debtor to present some evidence that (1) this particular home is necessary for the Debtor to maintain a minimal standard of living and (2) no alternative housing is available for a monthly rental payment commensurate with her current mortgage payment. See Miller v. Sallie Mae, Inc. (In re Miller), 409 B.R. 299, 321 (Bankr. E.D. Pa. 2009). With regard to the income the Debtor receives from Airbnb rentals, an analysis of the Debtor's own evidence indicates that relocation to an affordable rental unit and the resultant alleviation of the real estate tax obligation will more than offset the loss of rental income.

Id. at 9 (citation omitted).

In assigning probative weight to Schatz's exempt home equity, the court sidestepped the necessary evaluation of whether in the foreseeable future Schatz could increase her income and pay all or a portion of her student loans over time. The court erroneously concluded:

> However, the Court will not embark on a detailed [ ] analysis of whether any increase in [Schatz's] income would ever reach the level needed to make monthly payments on her remaining student loans. Rather, the outcome in this case turns on a separate, and dispositive, issue: the existence of substantial equity in the Debtor's Property that can be used to pay these student loans in full.

Id. at 7.

Also absent from the court's decision is a discussion of the public policy concerns embodied in the homestead exemption and those in § 523(a)(8), or the interplay between these

27

provisions and § 522(c).[9]   Although the court explicitly stated that "nothing in [its] opinion requires" Schatz to sell her home, the court did not make any findings as to how, as a practical matter, Schatz can tap the equity other than by a sale of the home.   This statement is also inconsistent with the court's observation that "the existence of equity that could be *liquidated* to satisfy the debts negates any claim that payment of the loans imposes an undue hardship," and its conclusion that "the *liquidation* of that equity will not result in [Schatz] being unable to maintain a minimal standard of living . . . ."   Id. at 9 (emphasis added).   The court's conclusion is at odds with the First Circuit's ruling in Cunningham that the proceeds from a sale of exempt property retains its exempt character and would not be liable for Schatz's pre-petition nondischargeable debt.   See 513 F.3d at 325.   Homing in on such equity as the dispositive factor, the bankruptcy court short-circuited its analysis by merely concluding that Schatz's equity in the Property, an amount well below the Homestead Law cap, "could be liquidated to satisfy the [student loan] debts . . . ."   584 B.R. at 9.

In view of the foregoing, we conclude that the bankruptcy court misapplied the totality of the circumstances test by ascribing dispositive weight to the mere existence of exempt equity in Schatz's home that exceeds the amount of her outstanding student loans.   In so doing it committed error by: (1) overlooking the policy supporting exemptions articulated in Law v. Siegel and In re Cunningham, supra, and not fully evaluating other relevant factors as cited in

---

[9]   The bankruptcy court relied upon the Armesto case for the proposition that "[t]he exempt character of an asset does not necessarily preempt its relevance to a hardship evaluation[.]"   In re Schatz, 584 B.R. at 8 n.6 (quoting Armesto, 298 B.R. at 48).   The exempt asset in play in Armesto was a tort recovery, not a homestead.   As such, the Armesto court did not need to address the unique policy concerns underlying the homestead exemptions under federal or state law which are presented here.   Also, there was no need to liquidate the tort recovery unlike Schatz's Property.   Additionally, rather than finding that the tort recovery funds could be applied to the student loan debt, the Armesto court instead considered whether the funds recovery would impact the debtor's standard of living, stating: "Even as supplemented by a fair allocation of the tort recovery, the debtor's income remains inadequate to assure a minimal standard of living."   Armesto, 298 B.R. at 48.

28

Hicks, supra, and its progeny. See In re Hicks, 331 B.R. at 31 (listing several factors to be assessed). Thus, the bankruptcy court incorporated consideration of exempt assets in its undue hardship analysis in a manner unsupported by the law of this circuit.

As a consequence, the record before us lacks findings on certain key factors typically considered in a proper application of the totality of the circumstances test, such as Schatz's future earning capacity through other potential employment opportunities as well as the impact, if any, of her health conditions on her future financial prospects. Given the fact-intensive nature of the undue hardship inquiry, we vacate the Order and remand to the bankruptcy court for further proceedings, including a proper application of the totality of the circumstances test that yields sufficient findings of fact and accords them an appropriate weight. See Bronsdon, 421 B.R. at 37 (where the district court vacated judgment and remanded in a student loan dischargeability case, concluding the bankruptcy court conducted an improper undue hardship analysis by giving exclusive weight to the availability of an income contingent repayment plan). In the absence of such findings, we can neither affirm nor reverse, but must remand. See Williams v. Poulos, 11 F.3d 271, 280-81 (1st Cir. 1993) ("[I]t is not ordinarily the province of appellate courts to make findings of fact or to resolve, in the first instance, mixed questions of law and fact.").

## CONCLUSION

In light of the foregoing, we **VACATE** the Order and **REMAND** for further proceedings consistent with this opinion.